**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEROME MALONE, derivatively on behalf of DEXCOM, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>KEVIN R. SAYER, JACOB S. LEACH, JEREME M. SYLVAIN, SEAN CHRISTENSEN, STEVEN R. ALTMAN, NICHOLAS AUGUSTINOS, RICHARD COLLINS, KAREN DAHUT, RIMA DRISCOLL, MARK G. FOLETTA, BRIDGETTE P. HELLER, KYLE MALADY, and ERIC TOPOL,<br><br>Defendants,<br><br>and<br><br>DEXCOM, INC.,<br><br>Nominal Defendant. | Case No.: 1:26-cv-03527<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>JURY TRIAL DEMANDED |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Jerome Malone ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant DexCom, Inc. ("DexCom" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Kevin R. Sayer ("Sayer"), Jacob S. Leach ("Leach"), Jereme M. Sylvain ("Sylvain"), Sean Christensen ("Christensen"), Steven R. Altman ("Altman"), Nicholas Augustinos ("Augustinos"), Richard Collins ("Collins"), Karen Dahut ("Dahut"), Rima Driscoll ("Driscoll"), Mark G. Foletta

1

("Foletta"), Bridgette P. Heller ("Heller"), Kyle Malady ("Malady"), and Eric Topol ("Topol") (collectively, the "Individual Defendants," and together with DexCom, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of DexCom, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, for violations of Sections 10(b), 20(a) and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Sayer, Leach, Sylvain, and Christensen for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding DexCom, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by DexCom's current and/or former directors and officers from January 8, 2024 through September 17, 2025, both dates inclusive (the "Relevant Period").

2. DexCom is a California company which designs, develops, and commercializes continuous glucose monitoring ("CGM") systems for patients with diabetes and other metabolic health issues. The Company launched its first flagship product, the DexCom G6 ("G6") in 2018. The G6 allowed users to have real-time glucose readings automatically sent to a compatible smart

2

device or receiver without the need for fingersticks or scanning. In 2023, the Company launched the successor to the G6 called the DexCom G7 ("G7"). The G7 offered, *inter alia*, a smaller sensor and transmitter, the ability to use the device during pregnancy, and additional alert settings. The G7 has consistently been touted as the Company's "most powerful [CGM] system" and "the most accurate CGM available."

3.      Throughout the Relevant Period, the Individual Defendants either made or caused the Company to make false and misleading statements, pertaining to the safety and accuracy of the G7. For example, on January 8, 2024, Defendant Sayer presented at the JPMorgan Healthcare Conference. During his presentation, Defendant Sayer identified that "any medical technology that comes out, the first thing you have to have is great science" and "***for G7, that great science starts with its accuracy. This is the most accurate sensor on the market today and the most accurate sensor that's ever been produced by us***."[1]

4.      Similarly, at approximately the same time, the Company posted advertisements to Facebook which referred to the G7 as the "***most accurate***" CGM and directed members of the public to "Dexcom data on file, 2023."

5.      Additionally, on February 18, 2025, DexCom filed its annual report on Form 10-K with the SEC reporting the Company's financial results for 2024 (the "2024 Form 10-K"). The 2024 Form 10-K further touted the accuracy and safety of the G7, stating that the G7 was "the most accurate CGM cleared by the FDA."

6.      However, unbeknownst to the public, in December 2023, the Company, in an attempt to produce G7s more quickly, altered the material used for the resistance layer of its sensors in the G7 from a third-party supplier to an in-house formulation without the required

---

[1] All emphasis herein has been added unless stated otherwise.

approval from the FDA. This alteration, later described by the U.S. Food and Drug Administration ("FDA") as an "adulteration," had a significant impact on the accuracy of the G7, at great risk to the health and safety of the Company's customers (the "G7 Adulteration Misconduct").

7.      Shortly thereafter, the FDA conducted inspections at the Company's facilities in Mesa, Arizona and San Diego, California. Following each inspection, the FDA privately issued Form 483s to Company management identifying various issues with the Company's manufacturing, quality control, and risk assessment processes, including: (1) inadequate processes regarding the thickness and coating of G7 sensors; (2) "design inputs" for both the G6 and G7 which were "not adequate;" (3) the Company's "functional acceptance testing of glucose sensors" was "not adequate" for either the G6 and G7; (4) the Company had failed to adequately establish procedures for "design output;" (5) the Company's failure to document and take steps to mitigate any risks associated with potential hazardous situations for the CGMs; (6) issues the Company's corrective and preventative action ("CAPA") processes; and (7) the previously mentioned adulteration of the sensor material for the G7 (collectively, the "Manufacturing Misconduct").

8.      The truth began to emerge on July 25, 2024, when the Company issued a press release reporting disappointing financial results for the second quarter of 2024 (the "2Q 2024 Earnings Press Release"). The 2Q 2024 Earnings Press Release reported the Company's quarterly revenue as $1.004 billion, or approximately 3.13% below the general market expectation of between $1.036 to $1.04 billion. The 2Q 2024 Earnings Press Release also lowered the Company's full year revenue guidance by approximately $300 million, from $4.20 - $4.35 billion to $4.00 - $4.05 billion.

9.      On this news, the price of the Company's stock fell $43.85 per share, or approximately 40.7%, from a closing price of $107.85 on July 25, 2024 to close at $64.00 per share on July 26, 2024.

10.     Then, on March 7, 2025, the Company filed a current report on Form 8-K with the SEC, announcing that DexCom had received a warning letter (the "Warning Letter") from the FDA regarding the G7 Adulteration Misconduct and the Manufacturing Misconduct (the "FDA Warning Letter From 8-K"). The FDA Warning Letter Form 8-K stated, in relevant part, that "[t]he warning letter describes observed non-conformities in manufacturing processes and quality management system." The FDA Warning Letter Form 8-K represented to investors that "[t]he warning letter does not restrict the Company's ability to produce, market, manufacture or distribute products, require recall of any products, nor restrict the Company's ability to seek FDA 510(k) clearance of new products."

11.     On this news, the price of the Company's stock fell $7.12 per share, or 9.2%, from a closing price of $77.84 per share on March 7, 2025 to close at $70.72 per share on March 10, 2025. However, the Individual Defendants continued to obfuscate the truth about the safety and accuracy of the Company's CGM devices.

12.     The truth fully emerged on September 18, 2025, when Hunterbrook Media LLC ("Hunterbrook") published a report entitled "Dexcom's Fatal Flaws" (the "Hunterbrook Report"). The Hunterbrook Report revealed that the risks posed by the G7 were severely downplayed by the Individual Defendants, since there were instances of customers being hospitalized or dying shortly after the Company's products provided inaccurate glucose readings. Notably, the Hunterbrook Report provided an analysis of FDA adverse event data revealing that "[a]ccuracy complaints comprise about 13% of all G7 reports, more than double the nearly 6% rate for the older G6

model." Moreover, the Hunterbrook Report stated that "G7 accuracy reports spiked dramatically for devices manufactured after December 2023, just when, as the FDA revealed, Dexcom implemented its unauthorized material change." The Hunterbrook Report also contained a chart which showed the accuracy complaint rate approximately tripling for devices manufactured after the material switch."

13.    The Hunterbrook Report further revealed that employees believed that Dexcom put the Company's profit margins over user safety, quoting a former regional account executive who stated that "Dexcom is trying to hold on to large revenue margins. And whenever you try and do that, *you are going to run into an area where you compromise the product, and I think they've done that*." The Hunterbrook Report also reported that a former senior scientist stated that the electrochemistry and membrane teams, the groups responsible for the unauthorized change to the G7, possessed weak scientific credentials and that "[t]he technical level was very low." Edward Carr, the Company's former senior director of manufacturing at its Mesa, Arizona facility, was quoted in the Hunterbrook report as having stated "Dexcom definitely dropped the ball." Mr. Carr added that the Company had grown "so fast, so quick, they could not really produce really good data and analysis to show [how] they had come up with the manufacturing processes."

14.    On this news, the price of the Company's stock fell $8.99 per share over the course of two trading sessions, or 11.8%, from a closing price of $76.44 per share on September 17, 2025, to close at $67.45 per share on September 19, 2025.

15.    During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to DexCom, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter*

*alia*, that: (1) the Company committed the Manufacturing Misconduct; (2) the Company committed the G7 Adulteration Misconduct; (3) the G7's reliability, accuracy, and functionality were overstated; (4) the scope and severity of the issues with the G7 were downplayed by the Individual Defendants; (5) as a result of the foregoing, the G7 was less reliable than prior iterations, which caused users to suffer material health risks; and (6) as a result, DexCom suffered increased regulatory scrutiny and enforcement, as well as legal, reputational, and financial harm. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

16.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while eight of the Individual Defendants engaged in improper insider sales, netting total proceeds of ***approximately $38.5 million.***

17.    In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing DexCom to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between July 2024 and September 2025, over 12.8 million shares of DexCom common stock were repurchased at artificially inflated prices, costing the Company over $937.2 million. As the Company's stock was actually worth only $67.45 per share, the price it was trading when markets closed on September 19, 2025, the Company overpaid for repurchases of its own stock by approximately $71.5 million in total.

18.    The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

19. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

20. In light of the Individual Defendants' misconduct—which has subjected the Company, its former Chief Executive Officer ("CEO"), its CEO, its Chief Financial Officer ("CFO"), and its Senior Vice President of Finance and Investor Relations to a consolidated federal securities fraud class action pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

21. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

22. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendants Sayer, Leach, Sylvain, and Christensen's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves and the other Individual defendants on behalf of the Company with the requisite level of disinterestedness and independence.

**JURISDICTION AND VENUE**

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), SEC Rule 10b5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

24.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

25.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

26.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of New York or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

27.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

**PARTIES**

**Plaintiff**

28.     Plaintiff is a current shareholder of DexCom. Plaintiff has continuously held DexCom common stock since first purchasing shares on February 18, 2022.

9

**Nominal Defendant DexCom**

29.     DexCom is a Delaware corporation with its principal executive offices at 6340 Sequence Drive, San Diego, California 92121. DexCom shares trade on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "DXCM."

**Defendant Sayer**

30.     Defendant Sayer has served as a Company director since November 2007 and as Chairperson of the Board since July 2018. He previously served as DexCom's CEO from January 2015 until December 2025.

31.     During the Relevant Period, while the Company's stock was artificially inflated before the schemes were exposed, Defendant Sayer made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
| --- | --- | --- | --- |
| January 16, 2024 | 37,325 | $123.63 | $4,614,669 |
| March 12, 2024 | 29,675 | $134.41 | $3,988,638 |
| March 12, 2024 | 12,470 | $131.47 | $1,639,427 |
| March 12, 2024 | 14,993 | $132.43 | $1,985,571 |
| March 12, 2024 | 20,930 | $133.55 | $2,795,145 |
| March 12, 2024 | 2,939 | $134.07 | $394,023 |
| April 8, 2024 | 27,272 | $138.71 | $3,762,489 |
| April 8, 2024 | 22,361 | $86.91 | $2,899,367 |
| January 29, 2025 | 33,359 | $86.91 | $2,899,367 |
| March 12, 2025 | 32,498 | $70.38 | $2,287,212 |

Thus, in total, before the fraud was exposed, Defendant Sayer sold 233,822 shares of Company common stock on inside information, for which he received approximately $27.5 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the schemes.

32.　　The Schedule 14A the Company filed with the SEC on April 15, 2026 (the "2026 Proxy Statement") stated the following about Defendant Sayer:

> Mr. Sayer's extensive executive experience operating companies in the diabetes and medical technology industry provides Dexcom with both operational and strategic industry-specific expertise to our Board.
>
> Key Experience and Qualifications:
> - Executive oversight of strategy and operations
> - Significant biosensing and diabetes industry experience

**Defendant Leach**

33.　　Defendant Leach has served as the Company's CEO and as a Company director since January 1, 2026. Previously, he served as DexCom's Chief Operating Officer ("COO") from August 2022 until December 2025 and as Interim CEO from September 15, 2025 until December 2025.

34.　　During the Relevant Period, while the Company's stock was artificially inflated before the schemes were exposed, Defendant Leach made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| January 16, 2024 | 3,978 | $123.63 | $491,891 |
| March 12, 2024 | 14,639 | $134.41 | $1,967,638 |
| June 10, 2024 | 745 | $115.05 | $85,713 |

| September 9, 2024 | 746 | $69.15 | $51,586 |
| December 16, 2024 | 744 | $76.87 | $57,191 |
| January 29, 2025 | 2,634 | $86.91 | $228,932 |
| March 12, 2025 | 14,076 | $70.38 | $970,670 |

Thus, in total, before the fraud was exposed, Defendant Leach sold 37,562 shares of Company common stock on inside information, for which he received approximately $3.9 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the schemes.

35.    The 2026 Proxy Statement stated the following about Defendant Leach:

Mr. Leach brings to our Board over 20 years of experience shaping the continuous glucose monitoring industry and listening to customers' needs to drive innovation and enhance user experience. With this deep expertise, he's led the glucose biosensing evolution at Dexcom, helping make metabolic health solutions accessible to millions of people.

* * *

Key Experience and Qualifications:
- Deep expertise in glucose biosensing innovation
- Extensive executive and operational leadership at Dexcom

**Defendant Sylvain**

36.    Defendant Sylvain has served as the Company's CFO since March 2021.

37.    During the Relevant Period, while the Company's stock was artificially inflated before the schemes were exposed, Defendant Sylvain made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
| --- | --- | --- | --- |

| January 16, 2024 | 2,734 | $123.63 | $338,018 |
| February 2, 2024 | 3,363 | $116.73 | $392,563 |
| March 12, 2024 | 11,661 | $134.41 | $1,567,363 |
| June 10, 2024 | 745 | $115.05 | $85,713 |
| September 9, 2024 | 746 | $69.15 | $51,856 |
| November 18, 2024 | 3,500 | $75.51 | $264,285 |
| December 16, 2024 | 744 | $76.87 | $57,191 |
| January 29, 2025 | 2,090 | $86.91 | $181,650 |
| March 10, 2025 | 2,670 | $73.22 | $195,489 |
| March 10, 2025 | 3,203 | $74.04 | $237,151 |
| March 10, 2025 | 1,127 | $74.70 | $84,189 |
| March 12, 2025 | 12,001 | $70.38 | $844,631 |
| September 2, 2025 | 4,824 | $74.17 | $357,796 |

Thus, in total, before the fraud was exposed, Defendant Sylvain sold 49,408 shares of Company common stock on inside information, for which he received approximately $4.7 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the schemes.

38.    The 2026 Proxy Statement stated the following about Defendant Sylvain:

Jereme Sylvain has served as our Chief Financial Officer since March 2021, and has served as our Chief Accounting Officer since March 2020. Prior to his role as Chief Financial Officer, Mr. Sylvain served as our Senior Vice President, Finance and Chief Accounting Officer since March 2020, and joined Dexcom in September 2018 as our Vice President, Finance and Corporate Controller. Prior to joining Dexcom, Mr. Sylvain held various positions at NuVasive, Inc., including Vice President, Corporate Controller and Chief Accounting Officer from August 2016

13

to September 2018 and Vice President, Corporate Controller from March 2014 to August 2016. Prior to joining NuVasive, Inc. Mr. Sylvain held the role of Senior Director, Finance with Thermo Fisher Scientific, where he was responsible for global accounting for the life sciences solutions group. Mr. Sylvain joined Thermo Fisher Scientific in February 2014, following its acquisition of Life Technologies Corporation. From July 2007 to February 2014, Mr. Sylvain held multiple finance and accounting roles at Life Technologies and its predecessor, Invitrogen Corporation. Prior to joining Invitrogen, Mr. Sylvain worked for the public accounting firm Ernst & Young LLP. Mr. Sylvain obtained his Certified Public Accounting license after receiving a B.A. in Finance from Arizona State University and a M.S. in Accountancy from the University of Notre Dame.

**Defendant Christensen**

39.    Defendant Christensen has served as the Company's Senior Vice President of Finance and Investor Relations since March 2026. Previously, he served various roles at the Company, most recently as Vice President of Financial Planning and Analysis and Investor Relations from September 2022 until March 2026.

**Defendant Altman**

40.    Defendant Altman has served as a Company director since November 2013. He also serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee.

41.    During the Relevant Period, while the Company's stock was artificially inflated before the schemes were exposed, Defendant Altman made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| January 16, 2024 | 460 | $121.97 | $56,104 |
| January 16, 2024 | 1,108 | $123.24 | $126,548 |

Thus, in total, before the fraud was exposed, Defendant Altman sold 1,568 shares of Company common stock on inside information, for which he received approximately $192,652 in total

proceeds. His insider sales, made with knowledge of material nonpublic information before the

material misstatements and omissions were exposed demonstrate his motive in facilitating and

participating in the schemes.

42.    The 2026 Proxy Statement stated the following about Defendant Altman:

Mr. Altman has extensive experience as a public company executive and provides expertise in business operations, legal matters and governance, and intellectual property and strategic licensing, providing valuable guidance and strategic direction to our Board.

* * *

Key Experience and Qualifications:
- Executive experience and oversight of corporate strategy and transactions
- Technical and operational leadership
- Corporate governance and legal
- Intellectual property and licensing strategy

**Defendant Augustinos**

43.    Defendant Augustinos has served as a Company director since November 2009. He

also serves as the Chair of the Nominating and Corporate Governance Committee.

44.    During the Relevant Period, while the Company's stock was artificially inflated

before the schemes were exposed, Defendant Augustinos made the following sales of Company

common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| June 13, 2025 | 2,618 | $81.69 | $213,864 |
| June 16, 2025 | 3,672 | $82.80 | $304,042 |

Thus, in total, before the fraud was exposed, Defendant Augustinos sold 6,290 shares of Company

common stock on inside information, for which he received approximately $517,906 in total

proceeds. His insider sales, made with knowledge of material nonpublic information before the

15

material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the schemes.

45.     The 2026 Proxy Statement stated the following about Defendant Augustinos:

With a 38-year career in healthcare and healthcare technology, Mr. Augustinos has broad managerial, consulting and business development experience in the private and public sectors. Mr. Augustinos has worked with a diverse range of leading healthcare delivery systems, healthcare insurer, drug and medical device distribution and government organizations globally. He brings to the Board significant business, market development and technology experience with growth companies.

Key Experience and Qualifications:
- Business development, managerial, and technology leadership at growth companies
- Significant healthcare industry experience
- Audit and financial leadership experience at public healthcare companies
- Public company board experience

**Defendant Collins**

46.     Defendant Collins has served as a Company director since March 2017. He also serves as a member of the Audit Committee and the Nominating and Governance Committee.

47.     The 2026 Proxy Statement stated the following about Defendant Collins:

Mr. Collins has significant experience in healthcare insurance and administration, during a period in which UnitedHealth Group grew from a mid-cap health insurer into one of the largest public corporations in America, and provides operational and strategic expertise and valuable leadership experience to the Board.

Key Experience and Qualifications:
- Executive leadership in healthcare insurance and administration
- Corporate governance and risk management

**Defendant Dahut**

48.     Defendant Dahut served as a Company director from October 2020 to May 8, 2025. She also served as a member of the Compensation Committee and the Technology Committee.

16

49.     The Schedule 14A the Company filed with the SEC on March 27, 2025 (the "2025 Proxy Statement") stated the following about Defendant Dahut:

*Karen Dahut* has served on our Board since August 2020. In October 2022, Ms. Dahut was selected as the CEO of Google Public Sector, responsible for helping public sector clients digitally transform with the Google suite of products. Prior to this role, Ms. Dahut was the Sector President for Booz Allen's Global Defense business. Ms. Dahut held several leadership positions throughout the organization, including Chief Innovation Officer; Leader, Analytics and Data Science Business; and Leader, Economic and Business Analytics Capability. Before joining Booz Allen in 2002, Ms. Dahut served as comptroller for the Navy's premier biomedical research institute and as a United States Naval Officer. Ms. Dahut also actively serves on the Board of Directors for the National Air and Space Museum and the Center for New American Security. Additionally, Ms. Dahut has served as a Director of EisnerAmper LLP since August 2021. She previously served on the Board of Directors of Tech Data Corporation, an end-to-end technology distributor and Fortune 100 company, prior to its acquisition by Apollo Global Management in June 2020. Ms. Dahut received a Bachelor's degree in Finance from Mount Saint Mary's University and a Master's of Science degree from the University of Southern California's Viterbi School of Engineering. Ms. Dahut's considerable leadership experience qualifies her to serve on the Board.

**Defendant Driscoll**

50.     Defendant Driscoll has served as a Company director since August 2023. She also serves as a member of the Audit Committee and the Technology Committee.

51.     The Company's 2026 Proxy Statement stated the following about Defendant Driscoll:

With over two decades of executive experience, Ms. Driscoll has overseen a wide range of global transactions—including acquisitions, strategic alliances, joint ventures, and divestitures—and has played a key role in expanding businesses into new markets and categories. Her experience driving integrated growth initiatives across R&D, commercial organizations, and new business ventures positions her to contribute valuable insight to Dexcom's strategic direction and global expansion.

* * *

Key Experiences and Qualifications:
- Executive leadership of diverse, multinational teams to achieve corporate strategy for long-term growth

- Business development and mergers and acquisitions, including divestitures, joint ventures and collaborations
- Healthcare, pharma and consumer products experience globally

**Defendant Foletta**

52.    Defendant Foletta has served as a Company director since November 2014 and as Lead Independent Director since November 2015. He also serves as the Chair of the Audit Committee.

53.    During the Relevant Period, while the Company's stock was artificially inflated before the schemes were exposed, Defendant Foletta made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| June 17, 2024 | 7 | $115.18 | $806.26 |
| June 17, 2024 | 2,212 | $117.16 | $259,159 |
| June 17, 2024 | 475 | $117.77 | $55,942 |
| June 18, 2024 | 3,007 | $116.75 | $351,065 |
| June 18, 2024 | 299 | $117.25 | $35,056 |
| June 16, 2025 | 2,750 | $83.13 | $228,605 |
| July 17, 2025 | 2,742 | $85.17 | $233,528 |
| July 15, 2025 | 8 | $86.03 | $688 |
| August 15, 2025 | 2,555 | $81.02 | $207,003 |
| August 15, 2025 | 195 | $195 | $38,025 |

Thus, in total, before the fraud was exposed, Defendant Foletta sold 14,250 shares of Company common stock on inside information, for which he received approximately $1.4 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the

18

material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the schemes.

54.    The 2026 Proxy Statement stated the following about Defendant Foletta:

With more than two decades of financial leadership in healthcare, Mr. Foletta brings deep expertise in audit oversight, capital allocation, and financial strategy that supports Dexcom's continued growth and operational discipline.

* * *

Key Experiences and Qualifications:
- Audit and financial leadership experience at public healthcare companies
- Public company board experience

**Defendant Heller**

55.    Defendant Heller has served as a Company director since September 2019. She also serves as the Chair of the Compensation Committee.

56.    During the Relevant Period, while the Company's stock was artificially inflated before the schemes were exposed, Defendant Heller made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| June 14, 2024 | 1,000 | $113.55 | $113,550 |
| September 16, 2024 | 1,000 | $70.00 | $70,000 |
| December 16, 2024 | 1,000 | $76.87 | $76,870 |
| March 19, 2025 | 352 | $70.33 | $24,756 |

Thus, in total, before the fraud was exposed, Defendant Heller sold 3,352 shares of Company common stock on inside information, for which she received approximately $285,176 in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the

material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the schemes.

57.    The 2026 Proxy Statement stated the following about Defendant Heller:

Ms. Heller's leadership in scaling global consumer healthcare organizations supports Dexcom's continued international expansion and patient engagement initiatives.

\* \* \*

Key Experience and Qualifications:
- Significant executive leadership experience in consumer healthcare
- Global technology and manufacturing experience in scaling organizations

**Defendant Malady**

58.    Defendant Malady has served as a Company director since October 2020. He also serves as the Chair of the Technology Committee.

59.    During the Relevant Period, while the Company's stock was artificially inflated before the schemes were exposed, Defendant Malady made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| September 5, 2025 | 667 | $80.86 | $53,934 |

Thus, in total, before the fraud was exposed, Defendant Malady sold 667 shares of Company common stock on inside information, for which he received approximately $53,934 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the schemes.

60.    The 2026 Proxy Statement stated the following about Defendant Malady:

20

Mr. Malady brings to our Board extensive knowledge of transformational technology development, new product launches, and strategic transactions, having built a career translating network innovation into commercial impact.

Key Experience and Qualifications:
- Executive leadership roles across Verizon
- Deep technical expertise in network technology and infrastructure

### **Defendant Topol**

61.    Defendant Topol served as a Company director from July 2009 to May 8, 2025. He also served as a member of the Technology Committee.

62.    The Schedule 14A the Company filed with the SEC on April 22, 2024 (the "2024 Proxy Statement") stated the following about Defendant Topol:

> ***Eric J. Topol, M.D***. has served on our Board since July 2009. Since January 2007, Dr. Topol has served as the Director of the Scripps Translational Science Institute, a National Institutes of Health funded program of the Clinical and Translational Science Award Consortium. He is Executive Vice President and Professor of Molecular Medicine at the Scripps Research Institute, and a senior consulting cardiologist at Scripps Clinic. Prior to Scripps, Dr. Topol served on the faculty of Case Western Reserve University as a professor in genetics, chaired the Department of Cardiovascular Medicine at Cleveland Clinic for 15 years and founded the Cleveland Clinic Lerner College of Medicine. Dr. Topol serves as a digital medical advisor to Blue Cross Blue Shield Association. In April 2009, he co-founded the West Wireless Health Institute, a non-profit foundation for applied medical research and policy on the prevention of aging. As a practicing physician, academic and thought leader in wireless healthcare technologies, Dr. Topol is uniquely situated to provide the Board with guidance on its technology, clinical and market development.

### **Relevant Non-Parties**

63.    The Consolidated Amended Complaint in the Securities Class Action captioned *Union Asset Management Holding AG v. Dexcom, Inc., et al*, Case No. 1:25-cv-08912-KPF, in the Southern District of New York (the "Amended Class Action Complaint"), incorporates statements from former employees of DexCom who offered their experiences. The following are the former employees whose statements are referenced throughout this complaint before this court.

*Former Employee 1*

64.      Former Employee 1[2] was employed as a Director of Manufacturing Operations at the Company's Mesa manufacturing facility from July 2023 through the end of 2024.

*Former Employee 2*

65.      Former Employee 2 previously worked for the Company as a Systems Requirements Engineer from December 2024 through August 2025. Former Employee 2's responsibilities included the writing of system requirements for the G7 in addition to working on the Company's response to the Warning Letter issued in March 2025.

*Former Employee 4*

66.      Former Employee 4 worked for the Company in its procurement organization prior to 2023 and during the Relevant Period.

*Former Employee 6*

67.      Former Employee 6 worked for the Company as a Manufacturing Manager at the Company's Mesa Facility from September 2021 through August 2024.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

68.      By reason of their positions as officers and/or directors of DexCom and because of their ability to control the business and corporate affairs of DexCom, the Individual Defendants owed DexCom and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage DexCom in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of DexCom and its shareholders so as to benefit all shareholders equally.

---

[2] Former DexCom employees are herein referred to as "Former Employee #" and are all referenced using masculine pronouns to maintain their confidentiality.

69. Each director and officer of the Company owes to DexCom and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

70. The Individual Defendants, because of their positions of control and authority as directors and/or officers of DexCom, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

71. To discharge their duties, the officers and directors of DexCom were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

72. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of DexCom, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised DexCom's Board at all relevant times.

73. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of

23

inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

74.     To discharge their duties, the officers and directors of DexCom were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of DexCom were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to DexCom's own Code of Conduct and Business Ethics ("Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how DexCom conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of DexCom and procedures for the reporting of the business and

internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that DexCom's operations would comply with all applicable laws and DexCom's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

75. Each of the Individual Defendants further owed to DexCom and the shareholders the duty of loyalty requiring that each favor DexCom's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

76. At all times relevant hereto, the Individual Defendants were the agents of each other and of DexCom and were at all times acting within the course and scope of such agency.

25

77. Because of their advisory, executive, managerial, and directorial positions with DexCom, each of the Individual Defendants had access to adverse, non-public information about the Company.

78. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by DexCom.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

79. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

80. The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

81. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of DexCom was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

82.    Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

83.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of DexCom and was at all times acting within the course and scope of such agency.

## DEXCOM'S CODE OF CONDUCT AND BUSINESS ETHICS

84.    The Company's Code of Ethics states it "applies to every person conducting business for Dexcom worldwide."

85.    Under the heading "Obligations to the Code," the Code of Ethics states

Dexcom expects its leaders to help foster a strong commitment to this Code and to promote a culture of fairness, honesty, integrity, and accountability. We also must ensure that our suppliers, agents, and other third parties hold themselves to the same high standards.

86.    Under the heading "Obligations to the Code," in a subsection titled "Speaking Up and Asking Questions," the Code of Ethics states:

All Employees are expected to uphold Dexcom's mission and values and commitment to this Code. If you need help understanding this Code, or how it applies in any given situation, do not hesitate to contact your supervisor or the Compliance Department.

It is your obligation to speak up and alert the Company to possible violations of this Code by others. We are committed to fostering an environment where open and honest communication is the expectation, not the exception. If you are unsure if a situation could be a violation of this code, reach out and ask questions.

27

87.    Under the heading "Healthcare Laws and Regulatory Requirements," the Code of

Ethics states, in relevant part:

> Dexcom is subject to many laws and regulations designed to protect patients and consumers, improve the quality of medical devices and healthcare services, and help eliminate fraud and improper influence on medical judgment.
>
> Our success depends upon every Employee's commitment to following these laws and regulations. While you are not expected to have complete mastery of all laws and regulations, you are expected to raise questions, identify issues, and consult with others to determine the appropriate course of action.

88.    Under the heading "Fair Business Dealings," the Code of Ethics states, in relevant

part:

> Dexcom strives to compete vigorously in the marketplace through superior business performance, quality, service, and price, and not through unethical or illegal business practices.
>
> Guiding Principles
>
> ● We are all expected to deal fairly and honestly with Dexcom customers, suppliers, employees, and any others we engage with while performing work for Dexcom

89.    Under the heading "Clinical, Regulatory Affairs, and Quality," the Code of Ethics

states:

> The products designed, manufactured, and sold by Dexcom are regulated by government authorities throughout the world.
>
> To ensure safety, product quality, and regulatory compliance, Dexcom adheres to regulatory and generally accepted good manufacturing, good clinical, and good laboratory practices in addition to our internal quality system requirements. Dexcom is dedicated to ensuring that our products consistently meet or exceed the quality standards required in the medical device industry. We uphold the highest standards of patient safety and well-being.
>
> Guiding Principles
>
> ● Dexcom Employees must be aware of and comply with the laws and regulations that are relevant to their job duties.

28

● We are committed to timely and accurate reporting to regulators and to maintaining open, honest, and professional relationships with regulators.

● Clinical trials must be conducted in accordance with regulatory and ethical standards.

● Every Employee at Dexcom must report to Quality any concerns or issues relating to compromises in quality or patient safety in a timely manner.

90.     Under the heading "Accuracy of Corporate Books and Records," the Code of Ethics states:

Dexcom's financial books, records, and accounts must fully, accurately, and fairly reflect business transactions.

They must also comply with applicable laws, regulations, and accounting practices, as well as internal policies and procedures. This helps Dexcom meet our obligations to investors, employees, and business partners, as well as the public and government agencies.

Guiding Principles

● All Employees are responsible for ensuring any books and records they create or are responsible for are compliant. We can achieve that by ensuring:

● All records are complete, accurate, and honest.

● All records are submitted in a timely manner.

● All records are in accordance with applicable standards and internal policies and procedures.

● All records are retained or destroyed according to the Records Retention Policy.

 ● All Employees cooperate fully during any inquiries from Dexcom or its external partners.

● All Employees must immediately report to Finance and/or Legal any incomplete, unfair, or inaccurate public disclosures as well as awareness of any transaction or development that may require disclosure.

91.     Under the heading "Conflicts of Interest," the Code of Ethics states, in relevant part:

29

A conflict of interest can occur when:

● Your personal interests, or those of a close personal friend or family member, interfere – or appear to interfere – with those of Dexcom.

● You, or a close personal friend or family member, take actions or have interests that may make it difficult to perform work for Dexcom objectively and effectively.

● You, or a close personal friend or family member, receive improper personal benefits as a result of your position with Dexcom.

Guiding Principles

● Evaluate potential conflicts. Ask yourself if an activity or relationship could:

● Cause an improper benefit to an Employee or a relative/friend, directly or indirectly.

● Appear improper to an outsider.

● Interfere with job performance or morale.

● Influence your access to or involvement with confidential Company information, resources, or decision-making.

● We are all responsible for avoiding situations where loyalties may be divided between Dexcom's interests and our own.

● Dexcom Employees should seek to avoid even the appearance of a conflict of interest.

92.     Under the heading "Insider Information and Trading," the Code of Ethics states:

Material, Non-Public Information

What is it? Material, non-public information is any information that has not yet been released to the public that an investor might consider important in determining whether to buy, sell, or hold a security.

While conducting business for Dexcom, including discussions with customers, distributors and/or suppliers, we may become aware of material non-public information about Dexcom or other organizations. **Employees must exercise the utmost care when in possession of material, non-public information and only use such information to conduct Company business.**

Guiding Principles

30

● Insider trading is strictly prohibited. Never purchase or sell, either directly or through another person, any type of security while you are aware of material, non-public information about Dexcom or other companies.

● Tipping is also prohibited. "Tipping" refers to providing material, non-public information regarding Dexcom or another publicly traded company to family, friends, or others

● Do not buy or sell Dexcom securities in a way that may give rise to the appearance of impropriety.

(Emphasis in original).

93.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to engage in the G7 Adulteration Misconduct and the Manufacturing Misconduct and to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics and law.

## DEXCOM'S AUDIT COMMITTEE CHARTER

94.     The Company's Audit Committee Charter (the "Audit Committee Charter") states the "Purpose of the Audit Committee as:

The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of DexCom, Inc. (the "Company") is to assist the Board in fulfilling its statutory and fiduciary oversight responsibilities relating to the Company's financial accounting, reporting and controls. The Committee's principal functions are to:

• oversee the accounting and financial reporting processes of the issuer and the audits of the financial statements of the issuer;

31

• monitor the periodic reviews of the adequacy of the accounting and financial reporting processes and systems of internal control that are conducted by the Company's independent auditors and the Company's financial and senior management;

• review and evaluate the independence and performance of the Company's independent auditors;

• review with management the Company's major financial risk exposures and the steps management has taken to monitor or mitigate such exposures; and

• facilitate communication among the Company's independent auditors, the Company's financial and senior management and the Board.

 In order to serve these functions, the Committee will have unrestricted access to Company personnel and documents, and will have authority to direct and supervise an investigation into any matters within the scope of its duties.

While the Committee has the responsibilities and powers set forth in this charter, it is not the duty of the Committee to plan or conduct audits or to determine that the Company's financial statements are complete and accurate and are in accordance with generally accepted accounting principles. This is the responsibility of management and the Company's independent auditors.

95.    Under the heading "Responsibilities and Duties," in a subsection titled "Financial Statements and Disclosures," the Audit Committee Charter states the Audit Committee's responsibilities in relevant part, as:

The Committee will:

1. Review and discuss with management the quarterly results and the type and presentation of information to be included in the Company's related earnings press release prior to distribution to the public.

2. Review and discuss with management the Company's quarterly and annual financial statements and any report or opinion by the independent auditors, prior to distribution to the public or filing with the Commission.

 3. In connection with the Committee's review of the annual financial statements:

• Discuss with the independent auditors and management, any internal audit department and management the financial statements and the results of the independent auditors' audit of the financial statements.

• Discuss any items required to be communicated by the independent auditors in accordance with the applicable requirements of the Public Company Accounting Oversight Board (the "PCAOB") Statement on Auditing Standards ("SAS") No. 114, The Auditor's Communication With Those Charged with Governance (supersedes No. 61, Communication With Audit Committees) (Codification of Statements on Auditing Standards, AU § 380), as amended. These discussions should include the independent auditors' judgments about the quality and appropriateness of the Company's accounting principles, the reasonableness of significant judgments, the clarity of the disclosures in the Company's financial statements and any significant difficulties encountered during the course of the audit, including any restrictions on the scope of work or access to required information.

• Discuss with management and the independent auditors the Company's selection, application and disclosure of critical accounting policies and practices.

4. Recommend to the Board whether the annual financial statements should be included in the Company's Annual Report on Form 10-K.

5. In connection with the Committee's review of the quarterly financial statements:

• Discuss with the independent auditors and management the results of the independent auditors' SAS No. 100, Interim Financial Information (Codification of Statements on Auditing Standards, AU § 722) or similar review of the quarterly financial statements.

• Discuss significant issues, events and transactions and any significant changes regarding accounting principles, practices, judgments or estimates with management and the independent auditors, including resolution of any disagreements among management and the independent auditors regarding financial reporting.

6. Discuss on a general basis the type of information to be disclosed and type of presentation to be made regarding financial information and earnings guidance to analysts and rating agencies.

7. Review any (i) the adequacy of the Company's accounting and financial reporting processes and systems of internal controls, (ii) any significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting or (ii) fraud involving management or any employee of the Company with a significant role in the Company's internal controls over financial reporting that are disclosed to the Audit Committee by the Company's Chief Executive Officer and Chief Financial Officer in connection with such officers' periodic review of the Company's internal controls over financial reporting.

96.    Under the same heading, in a subsection titled "Internal Controls," the Audit Committee Charter states:

The Committee will:

1. Discuss with the Company's principal accounting officer the function of the Company's disclosure controls and procedures and any disclosure committee that may be established by the Company. Discuss with the Company's Chief Executive Officer and Chief Financial Officer their conclusions regarding the effectiveness of the Company's disclosure controls and procedures.

2. Review any fraud involving management or any employee of the Company with a significant role in the Company's internal controls over financial reporting that are disclosed to the Committee.

3. Discuss with the independent auditors and management, including the principal accounting officer, their periodic reviews of the adequacy of the Company's accounting and financial reporting processes and systems of internal control, including the adequacy of the systems of reporting to the Committee by each group.

4. Discuss any comments or recommendations of the independent auditors outlined in their annual management letter or internal control reports. Approve a schedule for implementing any recommended changes and monitor compliance with the schedule.

5. Periodically consult with the independent auditors out of the presence of management about internal controls, the fullness and accuracy of the Company's financial statements and any other matters that the Committee or these groups believe should be discussed privately with the Committee.

6. Review with management the Company's major financial risk exposures and the steps management has taken to monitor such exposures, including the Company's procedures and any related policies, with respect to financial risk assessment and financial risk management.

7. Establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and (ii) the confidential anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters. Review any such complaints and submissions that have been received, including the current status and the resolution if one has been reached.

8. Consider the establishment and oversee the activities of an internal audit function within the Company.

97.     Under the same heading, in a subsection titled "General," the Audit Committee

Charter states, in relevant part:

The Committee will:

1. Review on a regular basis the status of any legal matters that could have a significant impact on the Company's financial statements.

2. Annually prepare a report to the Company's stockholders for inclusion in the Company's annual proxy statement as required by the rules and regulations of the Commission, as they may be amended from time to time.

3. Review and reassess the adequacy of the Committee's charter at least annually, and recommend to the Board any changes the Committee determines are appropriate.

4. Evaluate the Committee's composition and performance on an annual basis.

***

7. Consider waivers of the Code of Conduct (other than transactions that are subject to review by the Board as a whole or any other committee of the Board), as defined by applicable law and the Rules.

8. Review with management major legal and compliance risk exposures as they apply to matters that may impact the financial reporting or risk disclosures of the Company and the steps management has taken to monitor or mitigate such exposures, including the Company's procedures and any related policies with respect to financial risk assessment and management.

9. Perform any other activities required by applicable law, rules or regulations, including the rules of the Commission and any exchange or market on which the Company's capital stock is traded, and may perform other activities that are consistent with this charter, the Company's Certificate of Incorporation and Bylaws, and applicable laws, rules or regulations as the Committee or the Board deems necessary or appropriate.

98.     The Individual Defendants who served on the Company's Audit Committee during

the Relevant Period violated the Audit Committee Charter by engaging in or permitting the

Company to engage in issuing materially false and misleading statements to the investing public

and facilitating and disguising the Individual Defendants' violations of law, including breaches of

fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act.

In addition, the Individual Defendants who served on the Company's Audit Committee during the

Relevant Period violated the Audit Committee Charter by failing to adequately oversee the

integrity of the Company's financial disclosures, failing to adequately oversee the Company's

compliance with legal and regulatory requirements, failing to adequately oversee the Company's

risk assessments and risk management, failing to adequately discuss with management the

Company's financial information prior to public distribution, and failing to adequately oversee the

Company's disclosure controls and procedures.

### DEXCOM'S TECHNOLOGY COMMITTEE CHARTER

99.    The Company's Technology Committee Charter (the "Technology Committee

Charter") defines the "Purpose," of the Technology Committee Charter as:

> The purpose of the Technology Committee (the "Committee") is to assist the Board
> of Directors (the "Board") of DexCom, Inc. (the "Company") in reviewing
> technology development and to oversee and advise the Board on matters of
> innovation, new product development and technology, as well as to assist the Board
> in its oversight of the Company's information technology internal controls,
> cybersecurity, business continuity and disaster recovery programs, and the
> guidelines, policies and processes for monitoring and mitigating information
> technology and cybersecurity risks.

100.    Under the heading "Responsibilities and Duties," the Technology Committee

Charter states:

> The principal responsibilities and duties of the Committee in serving the purpose
> outlined in Section I of this charter (the "Charter") are set forth below. These duties
> are set forth as a guide, with the understanding that the Committee will carry them
> out in a manner that is appropriate given the Company's needs and circumstances.
> The Committee may supplement them as appropriate and may establish policies
> and procedures from time to time that it deems necessary or advisable in fulfilling
> its responsibilities. The Committee will:
>
> 1. Review, evaluate and make recommendations to the Board regarding the
> Company's major technology plans and strategies, including its research and

development activities, as well as, technical and market risks associated with product development and investment.

2. Assess existing and potential new advanced technology markets.

3. Monitor and evaluate future trends in technology that may affect the Company's strategic plans, including monitoring of overall industry trends.

4. Review the Company's research and development activities and product pipeline, and timelines for achievement of activities and pipeline.

5. Monitor the Company's progress against program objectives, including revenue, efficiency and product development targets.

6. Periodically, but at least four times per year, review cybersecurity, privacy, data protection and other major information technology risk exposures of the Company, the steps management has taken to monitor and control such exposures, and the Company's compliance with applicable information security and data protection laws and industry standards.

 7. Review or discuss any comments or recommendations of outside experts with regard to cybersecurity and other major information technology risk exposures, and, if appropriate, approve a schedule for implementing any recommended changes and monitor compliance with such schedule.

8. Perform any other activities consistent with this Charter, the Company's Bylaws and governing law as the Committee or the Board deems necessary or appropriate.

9. Make such reports and recommendations to the Board and its committees as the Committee may consider necessary or appropriate and consistent with its purpose, and take such other actions and perform such other services as may be referred to it from time to time by the Board.

101.    The Individual Defendants who served on the Company's Technology Committee during the Relevant Period violated the Technology Committee Charter by failing to assist the Board in the oversight of the Company's technical and market risks associated with product development and investment, failing to monitor the Company's progress against program objectives, and failing to monitor and evaluate future trends in technology that may affect the Company's strategic plans.

37

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background on DexCom

102.    DexCom is a California company which designs, develops, and commercializes CGM systems for patients with diabetes and other metabolic health issues. Leading into and throughout the Relevant Period, all of the Company's revenue was generated by sales of its CGM systems.

103.    The Company launched its first flagship CGM product, the G6 in 2018. The G6 allowed users to measure their glucose levels without the need for fingersticks or scanning, the ability to monitor and send glucose readings to a compatible smart device and send alerts to users when their glucose levels were low.

104.    Historically, the Company sold its products through the Durable Medical Equipment ("DME") channel. Namely, this channel meant that diabetes patients could not go to a pharmacy to have their prescriptions filled, but instead involves a more complex and higher-touch clinical support model, which includes home shipping and continuing patient assistance, while providing a higher per-unit reimbursement from insurers.

### CGMs and Applicable FDA Regulations

105.    Before CGMs, individuals who had diabetes could only measure the level of glucose in their blood by pricking their fingers daily, which was both painful and would not consistently track blood sugar fluctuations or trends.

106.    In the early 2000s, the introduction of CGMs was a major breakthrough in diabetes care, as those with diabetes no longer needed to prick their fingers. A CGM consists of a small sensor which is inserted under the skin and sends real-time data to a receiver or a smart device. A CGMs accuracy is essential, as having inaccurate blood glucose readings can result in significant health complications, if not death.

107.   CGMs are comprised of three interconnected systems: the sensor system, the transmitter system, and the receiver or display system. The sensor is primarily responsible for measuring blood glucose and, as a result, the actual accuracy of a CGM system. The sensor collects and measures the level of glucose in interstitial fluid jut under an individual's skin upon inserting the sensor into the upper arm or abdomen by using a small, disposable insertion device, being held in place by an adhesive patch.

108.   The sensors in a CGM collect data, which the transmitter then converts to estimated glucose values and sends these values to the receiver, which then displays glucose levels and alerts patients when their glucose levels fall outside of a set target range.

109.   In evaluating which CGM is right for them, individuals with diabetes rely on a CGM's Mean Absolute Relative Difference ("MARD"), an industry-standard metric which evaluates the accuracy of the CGM based on the average absolute difference between someone's blood glucose reading on the CGM and someone's actual blood glucose level per a blood sample.

110.   One of the avenues in which a Company can receive approval for commercial distribution of a CGM is through a 510(k) premarketing submission form, which is a faster and less intense alternative to the standard pre-market approval process for an entirely new device. Notably, 510(k) forms are for the marketing of device that are "substantially equivalent" to an already legally market "predicate device." Manufacturers are required to notify the FDA at least 90 days before commercially distributing devices of any steps taken by manufacturers to ensure that the device complies with the Food, Drugs, and Cosmetics Act's regulations. 510(k) forms are eventually posted to the FDA's website.

111.   Further, when a manufacturer alters a device such that the device's performance or effectiveness are impacted, the manufacturer must make a new 510(k) submission. Notably, FDA

guidance informs manufacturers that they should make a new 510(k) submission whenever "a change or modification in the device could significantly affect the safety or effectiveness of the device" or with respect to "changes to materials [that] may unintentionally affect the performance of the device."[3] Thus, even where a manufacturer believes a new 510(k) submission is not required, they still must perform confirmatory "routine verification and validation activities," and "reconsider" any decision not to submit a 510(k) where these activities provide for "any unexpected results."

112.    Upon receiving approval, manufacturers still have obligations to maintain the safety of devices. For example, the FDA requires manufacturers to "[s]ubmit reports of individual adverse events no later than 30 calendar days after the day that [the manufacturer] become[s] aware of a reportable death, serious injury, or malfunction."[4] These reports are stored in the FDA's Manufacturer and User Facility Device Experience ("MAUDE") database and are used by the FDA to identify safety issues and allocate investigative and enforcement resources.

### Facing Shrinking Market Share, the Company Needed to Pivot

113.    Leading up to and during the Relevant Period, the Company began to lose market share of the CGM market to its largest competitor, Abbott Laboratories ("Abbott").

114.    Notably, while the Company was winning the battle over accuracy, the G6 had a MARD of 9.0% while Abbott's Freestyle Libre 1 and 2 CGMs had MARDs of 9.4% and 9.3%, respectively, the Company was losing the battle over pricing, with Abbott's CGMs being two to three times less expensive than the G6 depending on insurance.

---

[3] *Deciding When to Submit a 510(k) for a Change to an Existing Device, Guidance for Industry and Food and Drug Administration Staff*, https://www.fda.gov/media/99812/download.
[4] 21 C.F.R. § 803.10(c)(1).

115. Given that 90% of the population of diabetes cases are Type 2, which are mainly considered not insulin-intensive, and thus are more concerned with how lifestyle changes impact glucose levels and not for insulin dosing, Abbott's cheaper CGMs were more attractive to many, causing the Company to consistently lose its market share to Abbott.

116. Then, in April 2019, Abbott began to develop its newest CGM, the Freestyle Libre 3, which was both cheaper than the G6 and had a MARD of 8.9%, even lower than the G6. As a result, the Company's business was threatened even further as Abbott had effectively closed the accuracy gap, causing DexCom to lose even more market share.

117. In order to boost its market share, by late 2020, the Company announced a growth initiative to begin selling its products to the larger, faster growing, non-insulin intensive population.

118. However, in order to achieve this, the Company had to find a way to enter the retail pharmacy distribution model that was used by the Type 2 diabetes population, which would require the Company to pay rebates to pharmacy benefit managers in order to secure placement, reducing profit margins. From 2021 through 2024, the Company's gross margin decreased consistently, falling to just 60.5% of total revenue in 2024.

119. This expansion also meant the Company would need to increase its production of CGMs to keep up with the added demand. By early 2023, the Company was producing over 100,000 CGMs per day through its facilities in Mesa, Arizona and San Diego, California. The Company also invested in a new, 900,000 square foot manufacturing facility that was set to open in Malaysia in 2024, which would add capacity for 200 million sensors per year.

120. However, the Company had other risks beyond manufacturing capacity, as it purchased various, critical components for its sensors from a single, third-party source. Among

these components were the "polymers used to synthesize polymeric membranes for our sensors," which were vital for the Company's CGMs.

121.    All of these pressures added up such that, by the start of the Relevant Period, the company needed to find a way to grow bigger and faster than ever by increasing and maintaining the production rate of the G7, all without raising the Company's costs.

### The Company Develops and Launches the G7

122.    In 2021, the Company began to develop the G7 as the successor to the G6.

123.    On December 15, 201, the Company submitted a Form 510(k) for FDA approval of the G7 by relying on the FDA's previous approval of the G6, presenting the results of two studies performed during G7 clinical trials. Study 1, which was conducted to review the G7's safety and effectiveness, found that approximately 93.5% of the G7's readings were within 20% of laboratory-grade glucose analyzer results, which were generally maintained through a 10-day wear period. Study 2, which was conducted to review the G7's ability to transmit real-time glucose data to a receiver or display device, found that the G7 delivered glucose readings reliably 99.4% of the time through a 10-day wear period.

124.    Then, in January 2022, Defendant Sayer presented on behalf of the Company at the JP Morgan Healthcare Conference. During his presentation, Defendant Sayer reported that a 308-person trial showed the G7 had a MARD of 8.2% for adults and 8.1% for children.

125.    On December 9, 2022, the Company issued a press release announcing that on December 8, it had received authorization from the FDA to market the G7. According to the "Decision Summary" from the FDA, based on the information submitted in the 510(k), the G7 met safety and accuracy standards required from CGMs. In this same Decision Summary, the FDA reminded the Company of the obligations required for commercialized devices under the Food,

Drugs, and Cosmetics Act, namely that the Company must participate in post-market surveillance of how the G7 was performing in the real world (also requiring the Company to report adverse events to the FDA).

126. On February 7, 2023, the Company launched the G7. The G7 offered numerous upgrades compared to the G6, including, *inter alia*, a smaller sensor and transmitter, the ability to use the device during pregnancy, and additional alert settings. As DexCom's latest flagship CGM device, its commercial success is of the upmost importance to the Company.

127. The press release the Company issued in connection with the launch of the G7 highlighted that "with an overall MARD of 8.2%, Dexcom G7 is the most accurate CGM on the market."

128. Notably, since the Company's original 510(k) for the G7 in December 2021, the Company had made additional submissions for the G7, including: (1) an April 14, 2023 510(k) requesting the FDA approve a modification to the G7's adhesive patch; (2) a December 28, 2023 510(k) requesting the FDA approve a function which allows users to display glucose data on smartwatches; and (3) an April 1, 2024 510(k) requesting the FDA approve the extension of the G7's Bluetooth range from 20 feet to 33 feet (the "April 2024 510(k)").

### The G7 Adulteration Misconduct

129. The G7's sensors are coated in multiple layers, each of which impact the functionality of the sensor. The innermost layer contains an enzyme known as "glucose oxidase" which catalyzes the oxidation of glucose into gluconic acid and hydrogen peroxide, using up oxygen in the process. The hydrogen peroxide then creates an electrical current that is proportional to glucose concentration, which the sensor then measures.

130.    In order to receive an accurate glucose reading, this reaction must function without interference. To protect from interference, a sensor is covered by a "resistance layer" which is typically comprised of a thermoplastic polyurethane. The resistance layer is crucial to the sensor's accuracy, as it protects the glucose oxidase from the exterior environment and also limits the diffusion of molecules or ions, other than glucose, that could potentially interfere with the CGM's functions.

131.    In December of 2023, DexCom altered the material used for the resistance layer of its sensors in the G7 from a third-party supplier to an in-house formulation without the required approval from the FDA. In making the switch, the Company would be able to maintain its high production levels of the G7, allowing it to expand sales and recapture its lost market share.

132.    According to the FDA, the Company was required to obtain regulatory approval for this change because the formulation had deviated from the one in which the G7 had been granted FDA approval and there was not an equivalency in performance between the third-party material and the in-house solution. In fact, DexCom's own internal studies represented that the in-house solution performed worse on "every accuracy metric" and that users "may experience differences in accuracy over the 10.5- day sensor wear period."

133.    Despite this, even after December 13, 2023, the Individual Defendants and the Company continued to highlight the G7's accuracy after the Company's modification, or as the FDA called it, "adulteration," of the sensor.

134.    As a result of the conclusion of the clinical study into the new resistance layer material, the Company conducted a "failure investigation," aimed at understanding why the original study had failed, as opposed to remedying the issue. Notably, despite this, the Company neglected to submit a 510(k) for the new resistance layer material.

135. According to MAUDE reports, most of which were reported by the Company itself, prior to the G7 Adulteration Misconduct, between the G7's release on February 17, 2023 and December 12, 2023, the average number of monthly complaints regarding the G7 was approximately 4,000, of which approximately 460 were related to the accuracy of the Company's sensor readings. However, after December 13, 2023, this number spiked. Indeed, between December 13, 2023 and December 15, 2025, the average number of monthly complaints regarding the G7 was over 10,000, of which approximately 1,460 were related to the accuracy of sensor readings.

136. Despite this, throughout the Relevant Period, the Individual Defendants consistently hyped the accuracy of the G7. For example, on January 8, 2024, Defendants Sayer and Sylvain presented on behalf of the Company at the JPMorgan Healthcare Conference.

137. During his presentation, Defendant Sayer touted the Company's performance, noting that the Company just posted its "first $1 billion quarter," with revenues "over $3.61 billion" in 2023. Defendant Sayer attributed this success to the G7, noting "You can't achieve results like this, though, without having a great platform, and that's what our G7 is."

138. Defendant Sayer went on to promote the G7 to patients of Type 2 diabetes, noting that they should "try to trust and rely on that data," citing the "25 million people in the U.S. alone who have diabetes [but] … who are not on insulin" and could "benefit tremendously from CGM."

139. In discussing the guidance for the Company's revenue growth in 2024 of between 16 and 21% and growth margin guidance of between 63 and 65%, Defendant Sylvain claimed the guidance was based on "another year of record new patients" as the result of the G7. Defendant Sayer further explained that the Company had achieved 35% patient growth and 24% revenue

growth over the last year "*without skipping a beat on the capacity and manufacturing side*," as the result of the Company's manufacturing plant in Malaysia.

140. In a slide deck that accompanied the presentation, the G7 was described as "the new standard in CGM technology," with "*Most accurate*," being the first listed as the first characteristic of the G7 being backed up by the information the Company had "on file."

141. Also on January 8, 2024, the Company filed a Form 8-K with the SEC which highlighted the Company's 2023 revenue as the result of a "successful rollout of Dexcom G7."

142. On February 8, 2024, the Company held an earnings call to discuss its 2024 fourth quarter and full-year financial results (the "FY 2023 Earnings Call"). During the FY 2023 Earnings Call, the Company utilized a "DexCom Investor Presentation" which was almost identical to the presentation featured in the JPMorgan Healthcare Conference. The DexCom Investor Presentation used during the FY 2023 Earnings Call supported referenced the information about the G7 the Company had "on file." Notably, the information "on file" was derived from a separate G7 device, as the original contained adulterations substantially impacting its accuracy.

143. On the same day, DexCom filed its annual report on Form 10-K with the SEC for 2023 (the "2023 Form 10-K"). The 2023 Form 10-K stated that the G7 allows for "*more accurate glucose readings without interference from common medications … such as acetaminophen*[,]" despite the Company's failure to test for acetaminophen interference while manufacturing the product.

144. Moreover, the 2023 Form 10-K stated that the Company continued to "purchase certain components and materials used in manufacturing from single sources due to quality considerations, costs or constraints resulting from regulatory or other requirements," such as "seals used for the applicator and certain polymers used to synthesize polymeric membranes for our

sensors." Notably, the Company had already began the internal production of a key material required for the G7 sensor's "resistance layer," as opposed to reliance on an external supplier.

145.   On March 5, 2024, Defendant Christensen presented on behalf of the Company at the Raymond James Institutional Investors Conference in which he expressed the importance of the G7 to the Company's growth. During his presentation, Defendant Christensen stated that "[w]ith Dexcom G7, we have what we believe to be the standard in CGM technology around the world. ***G7 is the most accurate CGM that has been cleared by the FDA and offering that standard Dexcom performance that people have come to expect and trust over the years***."

146.   On April 1, 2024, the Company filed the April 2024 510(k) with the FDA, seeking approval to extend the G7's Bluetooth communication range from 20 feet to 33 feet. Regarding the G7, the April 2024 510(k) stated that "[***t***]***he subject device is as safe and effective as the predicate device and does not raise different questions of safety and effectiveness***." The April 2024 510(k) also stated that "[n]onclinical testing results … support that the device … is ***as safe and effective*** as the predicate device." Notably, on April 23, 2024, the FDA approved the Company's modified G7 in reliance of the Company's representations, concluding that the "fundamental scientific technology of the modified device has not changed."

***The Manufacturing Misconduct***

147.   Between June 10, 2024 and June 14, 2024, the FDA conducted an inspection of the Company's facility in Mesa, Arizona. Following the inspection, the FDA issued to Company management a Form 483 dated for June 14, 2024 (the "June 2024 Form 483"). A Form 483 is issued where an investigator observes conditions or practices that indicate whether a regulated product may be in violation of applicable regulations such that an FDA enforcement action may be required.

148. The June 2024 Form 483 was issued to the Senior Site Director at the Company's Mesa facility, Edward Carr, notifying the Company and management of manufacturing processes that the FDA inspectors found concerning.

149. The first of these concerns was for inadequate processes regarding the thickness and coating of the G7 sensors. The June 2024 Form 483 noted that the ranges set by the Company as acceptable for the key sensor dipping parameters was "extremely wide," which resulted in coatings being either extremely thin, thick, or non-uniform. Despite the non-uniform coatings, the Company still considered those sensors acceptable which "could lead to ***significant variability in sensor sensitivity and clinical accuracy***." Notably, the Company's own Process Engineering Director acknowledged the issue, stating "that sensors produced at the edge cases will likely exhibit non-conformities."

150. In response to this concern, the Company informed the FDA that its purported reasoning for not controlling the dipping process was because the Company was verifying the completed sensors at a later stage in the manufacturing process. However, the FDA did not accept this explanation, as the supposed verification failed to include key checks to confirm the accuracy of the sensors, including whether substances such as acetaminophen would interfere with the sensor.

151. The June 2024 Form 483 also flagged the Company's CAPA in response to the increased rate of complaints about its systems, including expanding a then-existing CAPA on September 21, 2023 to address complaints regarding the G7. The FDA had found that the Company had only initiated three of the CAPA's eight corrective measures in addressing the complaints.

***The FDA Identifies Additional Manufacturing Issues, Including the G7 Adulteration Misconduct***

152.   Between October 21, 2024 and November 7, 2024, the FDA conducted an on-site inspection of the Company's facility in San Diego, California. Upon the conclusion of the inspection, the FDA issued a second Form 483 to the Company (the "November 2024 Form 483"). The November 2024 Form 483 identified an additional seven issues with the Company's quality control systems and manufacturing and design processes, all of which impact the accuracy and reliability of the G7, including, critically, the adulteration of the G7.

153.   In addition to the adulteration of the G7, the November 2024 Form 483 also documented additional violations. Among these were that the "design inputs" for both the G6 and G7 were "not adequate," noting that the Company failed to document the MARD specifications that were used as an input and, regarding glucose sensitivity, noted the initial input but not the requirements for the expected wear period of the device.

154.   The November 2024 Form 483 also noted that the Company's "functional acceptance testing of glucose sensors" was "not adequate" for either the G6 and G7. Notably, this meant that the Company's testing systems at the final step of testing sensors for accuracy before they were put on the market showed multiple issues, namely that the Company was not monitoring the amount of glucose in the solutions used to test the completed sensors.

155.   The November Form 483 also identified that the Company had failed to adequately establish procedures for "design output." As a result, the error rates that the Company would accept between the predicted initial glucose sensitivity measures and the predicted final measures could "contribute to inaccurate glucose readings." In addition, the Company was sampling the average thickness across a batch of sensors in determining whether the batch would provide accurate readings, but neglected to do so for the individual sensors.

49

156. The November Form 483 also identified additional CAPA violations. Notably, the Company had identified an issue with its sensors in low-oxygen environments which triggered a CAPA. However, despite the CAPA investigation revealing systematic failure, the Company chose to release the sensors anyway, which the FDA considered "not adequate" given that DexCom "failed to evaluate the potential risk to users of devices manufactured with sensors" that went untested in the low-oxygen environment.

157. The November Form 483 further took issue with the Company's failure to document and take steps to mitigate any risks associated with potential hazardous situations for the CGMs. Notably, the Company failed to mitigate risks associated with patients whose CGM was paired with an automated insulin pump, as an inaccurate glucose reading could result in the insulin pump automatically triggering or failing to trigger, potentially over- or undersupply a patient with insulin that could ultimately lead to significant health consequences or death.

158. On December 3, 2024, the Company responded to the November 2024 Form 483 by including a study that showed the sensor equivalence for sensors made with the two resistance layer materials for the G7, which showed a "significant variation in the clinical performance" of the sensors produced with the new material because "the standard deviation of [the new material's] glucose sensitivity [was] twofold that of [the old material]." In the response, the Company also committed to stop distributing the G7s with the adulterated material, although any G7s that were already on the market remained in distribution.

159. On March 4, 2025, DexCom received the Warning Letter from the FDA resulting from issues with the Company's manufacturing processes and quality management systems at certain manufacturing facilities. While the Company disclosed the existence of the Warning Letter

to investors on March 7, 2025, the contents of the Warning Letter would not be revealed to the public until March 25, 2025, when the FDA posted the Warning Letter to its website.

160. However, the Individual Defendants continued to sell the idea that the adulteration to the G7 was immaterial and provided equivalent results. On March 27, 2025, *MedTech Dive* published an article titled "*Dexcom Rejects Claims of Unauthorized Device Changes in FDA Warning Letter*" (the "MedTech Dive Article"). The MedTech Dive Article reported that *MedTech Dive* had received an email in the days prior from Company spokesperson Nadia Conrad, which stated that "no design changes were made" to the Company's sensors. Moreover, spokesperson Conrad stated that "company notified the FDA both informally and formally through 510(k) submissions, following the guidelines for non-significant changes." Moreover, the MedTech Dive Article reported that spokesperson Conrad added that "***Dexcom qualified a second source for one of its raw materials*** … to ensure an uninterrupted supply to customers," and that "'***extensive testing' showed the material met specifications***."

161. On April 22, 2025, Defendant Leach represented the Company on the *Diabetes Connection* podcast (the "Diabetes Connection Interview"). During the Diabetes Connection Interview, the podcast host asked Defendant Leach whether the Company had "resolved" the "change Dexcom made to a component use in the resistance layer of its sensors," which was identified in the FDA Warning Letter. Defendant Leach responded by stating that the FDA was referring to "a material that we introduced."

162. On May 1, 2025, the Company held an earnings call to discuss its financial results for the first quarter of 2025 (the "1Q 2025 Earnings Call"). During the 1Q 2025 Earnings Call, an analyst asked the Company about particular "scary pictures" on "some of the chat boards and things like that," which denoted "some manufacturing issues on sensors." Defendant Leach replied

by denying reports of "manufacturing issues," and noting that the Company reviews the trends in public complaints by stating "sensor issues do happen and we've seen them on the boards." Moreover, Defendant Leach stated that "***there's no difference in frequency of those [sensor issues] from last year to this year***."

163.    On June 26, 2025, a Facebook user posted a message which they received from the Company. After the Facebook user noted that they had "almost 2 dozen faulty sensors [in] just the last seven months," the Company responded to their message by stating the Company "understood how critical accurate readings are for diabetes management" and that it was "addressing these concerns."

**<u>False and Misleading Statements</u>**

***January 8, 2024 JPMorgan Healthcare Conference***

164.    The Relevant Period began on January 8, 2024, when Defendants Sayer and Sylvain presented on behalf of the Company at the JPMorgan Healthcare Conference.

165.    In identifying the supposed drivers of this "platform," Defendant Sayer identified that "any medical technology that comes out, the first thing you have to have is great science" and "***for G7, that great science starts with its accuracy. This is the most accurate sensor on the market today and the most accurate sensor that's ever been produced by us***."

***January 22, 2024 through June 5, 2024 Facebook Advertisements***

166.    From January 22, 2024 through June 5, 2024, the Company issued several advertisements on Facebook, which, *inter alia*, referred to the G7 as the "***most accurate***" CGM and directed members of the public to "Dexcom data on file, 2023."

***February 8, 2024 Financial Reports***

167.    On February 8, 2024, the Company held FY 2023 Earnings Call.

168.    During the FY 2023 Earnings Call, Defendant Sayer stated that the "***G7 is the most accurate CGM ever launched*** and the market's reception to G7 has been exceptional." The DexCom Investor Presentation touted the G7 as "the new standard in CGM technology," and noted it as being "***[m]ost accurate***" when describing its characteristics.

169.    On the same day, DexCom filed the 2023 Form 10-K. The 2023 Form 10-K was signed by Defendants Sayer, Sylvain, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol. The 2023 Form 10-K also included certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Sayer and Sylvain attesting to the accuracy of the 2023 Form 10-K and that the 2023 Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

170.    The 2023 Form 10-K continued to represent that the accuracy of the G7 while utilizing MARD figures derived from unadulterated and substantially different versions of the product. For instance, the 2023 Form 10-K stated that "[*w*]***ith an overall Mean Absolute Relative Difference, or MARD, of 8.2%, as well as 94.1% of values within 20% of their comparator, Dexcom G7 is the most accurate CGM cleared by the FDA***."

171.    In addition, the 2023 Form 10-K contained several hypothetical risk factors affecting the Company's business operations and prospects, stating the following, in relevant part:

> ***[A]ny changes to our manufacturing processes may trigger the need for submissions or notifications to, and in some cases advance approval from, the FDA or other regulatory authorities because of the potential impact of changes on our previously cleared, approved and/or authorized devices***. Our facilities are subject to inspections by the FDA and corresponding state and international agencies on an ongoing basis, and we must comply with Good Manufacturing Practices and the FDA Quality System Regulation, as well as certain state requirements. ***We may be unable to adequately maintain, develop***

*and expand our manufacturing process and operations or maintain compliance with FDA and state and international agency requirements*.

\* \* \*

Any subsequent modifications of our cleared products that could significantly affect their safety or effectiveness (for example, a significant change in design or manufacture), or that would constitute a major change in its intended use, *will require us to obtain a new 510(k) clearance* or could require a new de novo submission or a PMA. The FDA requires each manufacturer to make this determination initially, but the FDA may review any such decision and may disagree with a manufacturer's determination. *If* the FDA disagrees with a manufacturer's determination, the FDA *may* require the manufacturer to cease marketing and/or recall the modified device until appropriate clearance or approval is obtained.

\* \* \*

The commencement or completion of any of our clinical trials *may* be … inadequate to support approval of FDA marketing applications or supplements, for numerous reasons, including, but not limited to, the following: regulatory inspections of our clinical trials or manufacturing facilities may results [sic] in allegations or findings of noncompliance and, among other things, require us to undertake corrective action[;] … the interim or final results of the clinical trial are inconclusive or unfavorable as to safety or efficacy; and the FDA concludes that the results from our trial and/or trial design are inadequate to demonstrate safety and effectiveness of the product.

\* \* \*

We conduct business in a heavily regulated industry and *if we fail to comply with applicable laws and government regulations, we could* become subject to penalties, be excluded from participation in government programs, and/or *be required to make significant changes to our operations*.

### March 5, 2024 Raymond James Institutional Investors Conference

172.    On March 5, 2024, Defendant Christensen presented on behalf of the Company at the Raymond James Institutional Investors Conference in which he expressed the importance of the G7 to the Company's growth. During his presentation, Defendant Christensen stated that "*G7 is the most accurate CGM that has been cleared by the FDA and offering that standard Dexcom performance that people have come to expect and trust over the years*." Defendant Christensen's

54

presentation included a slide which again stated that the G7 was the "***most accurate***" sensor available.

### *April 3, 2024 Annual Sustainability Report*

173.    On April 3, 2024, the Company issued its annual sustainability report (the "April 2024 Sustainability Report"), which contained an opening letter to the Company's "stakeholders" from Defendant Sayer. Defendant Sayer's letter in the 2024 Sustainability Report stated that the G7 provided "***the most accurate sensor technology***."

174.    The 2024 Sustainability Report also stated that "[*w*]*e maintain a robust global Quality Management System (QMS) in compliance with applicable U.S. and international regulatory requirements. This includes compliance with key regulations and standards like the FDA Quality System Regulation (QSR)*."

### *April 22, 2024 Proxy Statement*

175.    On April 22, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol solicited the 2024 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

176.    The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol to the Board; (2) ratify the selection of the Audit Committee of Ernst & Young LLP as the Company's independent registered public accounting from for the 2024 fiscal year; and (3) provide a non-binding advisory vote on the compensation for the Company's named executive officers for the 2023 fiscal year.

177.     Regarding "The Board of Directors' Role in Risk Oversight," the 2024 Proxy

Statement stated, in relevant part:

The Board is ultimately responsible for overseeing our risk assessment and risk management. In fulfilling this oversight role, our Board focuses on understanding the nature of our enterprise risks, including our operations and strategic direction, as well as the adequacy of our risk management process and overall risk management system. While the full Board has overall responsibility for risk oversight, the Board has delegated oversight responsibility related to certain risks to the standing committees of the Board.

The Board

At its regularly scheduled meetings, the Board receives management updates and committee reports regarding business operations, financial results, committee activities, strategy, and discusses risks related to the business. Through management updates and committee reports, the Board monitors our risk management activities, including the enterprise risk management process and cybersecurity risks, risks relating to our compensation programs, and financial, legal and operational risks.

Audit Committee

The Audit Committee assists the Board in its oversight of risk management by discussing with management our guidelines and policies regarding financial risk management, including major risk exposures, and the steps management has taken to monitor or mitigate such exposure.

*** 

Technology Committee

The Technology Committee assists the Board in its oversight of our technology plans and strategies, cybersecurity and major information technology risk exposures and the steps management has taken to monitor or mitigate such exposures.

*** 

Our Corporate Strategy Oversight Structure

Our Board actively oversees management's establishment and execution of corporate strategy, including major business and organizational initiatives, annual budget and long-term strategic plans, capital allocation priorities, potential corporate development opportunities, and risk management. Our objective is to

remain a leading provider of CGM systems and related products to enable people with diabetes to more effectively and conveniently manage their condition. We are also developing and commercializing products that integrate our CGM technologies into the insulin delivery systems or data platforms of our respective partners. In addition, we continue to pursue development partnerships with other insulin delivery companies, including automated insulin delivery systems, as well as other players in the disease management sector. The Board actively oversees our business strategies as we pursue these objectives.

The Board is regularly engaged with management on the Company's strategy. At its regularly scheduled meetings and throughout the year, our Board of Directors receives information and formal updates from our management and actively engages with the senior leadership team with respect to our corporate strategy. Our Board of Directors' diverse skill set and experience enhances its ability to support management in the execution and evaluation of our corporate strategy.

178.    Regarding the Company's Code of Ethics, the 2024 Proxy Statement provided:

We have adopted a Code of Conduct that is an essential resource for all of our officers, directors and employees. It outlines our values on a number of issues affecting our business, sets requirements for business conduct, and serves as the basis for our compliance program. The Nominating and Governance Committee reviews and assesses the adequacy of the Code of Conduct on at least an annual basis, and may recommend that the Board establish special committees as may be desirable or necessary from time to time in order to address ethical, legal or other matters that may arise.

We encourage employees to keep open lines of communication with their supervisor and/or department management. Our compliance Intranet website provides additional information, including a global directory of compliance personnel; links to our compliance helpline; current policies, procedures, and resources; and training materials. The compliance helpline is hosted by a third-party helpline provider. Reports through the compliance helpline may remain anonymous.

When required by the rules of Nasdaq, or the SEC, we will disclose any future amendment to, or waiver of, any provision of the Code of Conduct for our principal executive officer and principal financial officer or any member or members of our Board on our website within four business days following the date of such amendment or waiver.

179.    Regarding the Company's Audit Committee, the 2024 Proxy Statement stated the responsibilities of the Audit Committee as:

•Overseeing our accounting and financial reporting processes and the audits of our financial statements;

•Monitoring the periodic reviews of the adequacy of our accounting and financial reporting processes and systems of internal control that are conducted by our independent auditors and our financial and senior management;

•Reviewing and evaluating the independence and performance of our independent auditors;

•Reviewing with management our major financial risk exposures and the steps management has taken to monitor or mitigate such exposures; and

•Facilitating communication among our independent auditors, our financial and senior management and the Board.

180. Regarding the Company's Technology Committee, the 2024 Proxy Statement stated the responsibilities of the Technology Committee as:

•Reviewing, evaluating and making recommendations to the Board regarding our major technology plans and strategies, including our research and development activities, as well as technical and market risks associated with product development and investment;

•Reviewing our research and development activities and product pipeline, and timelines for achievement of activities and pipeline; and

•Regularly reviewing the cybersecurity, privacy, data protection and other major information technology risk exposures of the company, the steps management has taken to monitor and control such exposures, and our compliance with applicable information security and data protection laws and industry standards.

181. Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company committed the Manufacturing Misconduct; (2) the Company committed the G7 Adulteration Misconduct; (3) the G7's reliability, accuracy, and functionality were overstated; (4) the scope and severity of the issues with the G7 were downplayed by the Individual Defendants; (5) as a result of the foregoing, the G7 was less reliable than prior iterations, which caused users to suffer material health risks; and (6) as a result, DexCom

suffered increased regulatory scrutiny and enforcement, as well as legal, reputational, and financial harm. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

182.   The 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committee's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

183.   As a result of Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the selection of the Audit Committee of Ernst & Young LLP as the Company's independent registered public accounting from for the 2024 fiscal year; and (3) provide a non-binding advisory vote on the compensation for the Company's named executive officers for the 2023 fiscal year.

### *April 25, 2024 Financial Reports*

184.   On April 25, 2024, the Company held an earnings call discussing its financial results for the first quarter of 2024 (the "1Q 2024 Earnings Call"). On the 1Q 2024 Earnings Call, Defendant Sayer stated that "[*w*]*ith the launch of [the] G7, we extended our leadership in sensor accuracy*."

185.    The same day, the Company filed its quarterly report on Form 10-Q with the SEC for the first quarter of 2024 (the "1Q 2024 Form 10-Q"), which was signed by Defendants Sayer and Sylvain. The 1Q 2024 Form 10-Q contained SOX certifications signed by Defendants Sayer and Sylvain attesting to the accuracy of the 1Q 2024 Form 10-Q and that the 1Q 2024 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

186.    The 1Q 2024 Form 10-Q incorporated by reference the materially false and misleading risk factors set forth in the 2023 Form 10-K. *Supra* ¶171.

### June 5, 2024 William Blair Growth Stock Conference

187.    On June 5, 2024, Defendant Sylvain presented on behalf of the Company at the William Blair Growth Stock Conference. Defendant Sylvain touted the accuracy of the G7 during his presentation, describing the G7 as "***the most accurate sensor on the market***[,]" and described the G7 as the Company's "***trademark product, our flagship product***." The slides Defendant Sylvain's presentation again noted that the G7 was the "***most accurate***" CGM on the market.

### June 23, 2024 Drug Delivery Business Interview

188.    On June 23, 2024, Defendant Sayer represented the Company in an interview with Drug Delivery Business (the "DDB Interview"). During the DDB Interview, Defendant Sayer described the G7 as "***the most accurate sensor on the market still***," and that it will "***remain so***," asserting that the "***G7 is noticeably better than [the] G6 was, at least clinically***."

189.    The above statements in ¶¶164-174, 184-188 were materially false and misleading and failed to disclose, inter alia, that: (1) the Company committed the Manufacturing Misconduct; (2) the Company committed the G7 Adulteration Misconduct; (3) the G7's reliability, accuracy,

and functionality were overstated; (4) the scope and severity of the issues with the G7 were downplayed by the Individual Defendants; (5) as a result of the foregoing, the G7 was less reliable than prior iterations, which caused users to suffer material health risks; and (6) as a result, DexCom suffered increased regulatory scrutiny and enforcement, as well as legal, reputational, and financial harm. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge as the False and Misleading Statements Continue**

*July 25, 2024 Financial Reports*

190.    The truth began to emerge on July 25, 2024, when the Company issued the 2Q 2024 Earnings Press Release. The 2Q 2024 Earnings Press Release reported the Company's quarterly revenue as $1.004 billion, or approximately 3.13% below the general market expectation of between $1.036 to $1.04 billion. The 2Q 2024 Earnings Press Release also lowered the Company's full year revenue guidance by approximately $300 million, from $4.20 - $4.35 billion to $4.00 - $4.05 billion.

191.    On this news, the price of the Company's stock fell $43.85 per share, or approximately 40.7%, from a closing price of $107.85 on July 25, 2024 to close at $64.00 per share on July 26, 2024. However, the Individual Defendants continued to obfuscate the truth about the safety and accuracy of the Company's CGM devices.

192.    For example, the 2Q 2024 Earnings Press Release quoted Defendant Sayer as stating that "[*w*]*hile Dexcom advanced several key strategic initiatives in the second quarter, our execution did not meet our high standards*." The 2Q 2024 Earnings Press Release further attributed the Company's underperformance to irregular sales "*execution*" issues.

193.   On the same day, the Company held an earnings call to discuss its financial results for the second quarter of 2024 (the "2Q 2024 Earnings Call").

194.   During the 2Q 2024 Earnings Call, Defendant Sayer repeated the Company's previous assertions pertaining to one off "*execution*" problems.

195.   Defendant Sayer further stated that the Company had "***built upon the performance of G7, making it even better***." Moreover, the presentation accompanying the 2Q 2024 Earnings Call stated that the G7 was the "new standard" and "***most accurate***" CGM available.

196.   Also on July 25, 2024, the Company filed its quarterly report on Form 10-Q with the SEC for the second quarter of 2024 (the "2Q 2024 Form 10-Q"), which was signed by Defendants Sayer and Sylvain. The 2Q 2024 Form 10-Q contained SOX certifications signed by Defendants Sayer and Sylvain attesting to the accuracy of the 2Q 2024 Form 10-Q and that the 2Q 2024 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

197.   The 2Q 2024 Form 10-Q incorporated by reference the materially false and misleading risk factors set forth in the 2023 Form 10-K. *Supra*, ¶171.

### September 4, 2024 Wells Fargo Securities Conference Presentation

198.   On September 4, 2024, Defendants Sayer and Sylvain represented the Company at the Wells Fargo Securities Conference Presentation (the "2024 Wells Fargo Conference").

199.   During the 2024 Wells Fargo Conference, Defendants Sayer and Sylvain were asked questions pertaining to the "headwinds" for declining new patient starts and decreased guidance accompanying the Company's second quarter results. Defendant Sayer responded that "[*t*]*his is an execution hiccup … It's not a reflection of the quality of our product*."

*September 9, 2024 Facebook Advertisement*

200.    On September 9, 2024, the Company posted an advertisement to Facebook which stated that the G7 was the "***most accurate CGM***," and cited to the G7's original 510(k) approval.

*September 28, 2024 Diabetes Strong Interview*

201.    On September 28, 2024, Defendant Leach represented the Company in an interview on the *Diabetes Strong* podcast (the "Diabetes Strong Interview"). During the Diabetes Strong Interview, Defendant Leach stated that the "***G7 is the most accurate sensor we've ever created***."

202.    The interviewer later asked Defendant Leach "[w]hat do you offer that maybe some of the other . . . CGM providers here in the U.S. don't really provide?" Defendant Leach responded by stating "[***i***]***t starts with the sensor, right? And the performance and accuracy of the product is unmatched by anything out there. And so I think our number one, you know, advantage here is the sensors as accurate as any sensor available***."

*October 24, 2024 Financial Reports*

203.    On October 24, 2024, the Company held and earnings call to discuss the Company's third quarter results for 2024 (the "3Q 2024 Earnings Call").

204.    On the 3Q 2024 Earnings Call, Defendant Sayer was asked how the Company intended to "defend [its] position" in the Type 1 diabetes market. Defendant Sayer replied by stating that "[o]ver time, our reputation in this market and one of the places we've been always strong is in this type 1 market because that has been where we have had the largest market share advantage for a very long time, and we intend to maintain that through the higher quality of our product." Defendant Sayer added that "at the end of the day, it matters. ***The accuracy of Dexcom is tried and true and proven to these patients***."

205.    Moreover, the presentation accompanying the 3Q 2024 Earnings Call repeated the Company's assertions that the G7 was the "new standard" and "***most accurate***" CGM available.

206.    On the same day, DexCom filed its quarterly report on Form 10-Q with the SEC for the third quarter of 2024 (the "3Q 2024 Form 10-Q"), which was signed by Defendants Sayer and Sylvain. The 3Q 2024 Form 10-Q contained SOX certifications signed by Defendants Sayer and Sylvain attesting to the accuracy of the 3Q 2024 Form 10-Q and that the 3Q 2024 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

207.    The 3Q 2024 Form 10-Q incorporated by reference the materially false and misleading risk factors set forth in the 2023 Form 10-K. *Supra* ¶171.

### *November 8, 2024 DexCom Investor Presentation*

208.    On November 8, 2024, the Company provided a "DexCom Investor Presentation," which continued to state that the G7 was the "new standard" and the "***most accurate***" CGM available.

### *February 13, 2025 Earnings Call*

209.    On February 13, 2025, the Company held an earnings call to discuss its full-year 2024 financial results (the "FY 2024 Earnings Call"). On the FY 2024 Earnings Call, Defendant Leach replied to an analyst's question concerning the accuracy of the Company's sensors by asserting the G7 to be "***the most accurate sensor available***."

### *February 18, 2025 Form 10-K*

210.    On February 18, 2025, DexCom filed the 2024 Form 10-K which was signed by Defendants Sayer, Sylvain, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady,

and Topol. Attached to the 2024 Form 10-K were SOX certifications signed by Defendants Sayer and Sylvain attesting to the accuracy of the 2024 Form 10-K and that the 2024 Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

211.   The 2024 Form 10-K continued to highlight the G7's capabilities and features, stating the G7 had an "***overall Mean Absolute Relative Difference, or MARD, of 8.2%***," as well as that the "***Dexcom G7 is the most accurate CGM cleared by the FDA***."

212.   The 2024 Form 10-K also stated that "[***w***]***e are committed to quality and believe that is best achieved through a safe and healthy workplace as well as a Quality Management System that is compliant with all applicable regulatory requirements and which is continuously being improved***."

213.   In addition, the 2024 Form 10-K repeated the same materially false and misleading risk factors set forth in the 2023 Form 10-K. *Supra* ¶171.

214.   The above statements in ¶¶ 192-213 were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company committed the Manufacturing Misconduct; (2) the Company committed the G7 Adulteration Misconduct; (3) the G7's reliability, accuracy, and functionality were overstated; (4) the scope and severity of the issues with the G7 were downplayed by the Individual Defendants; (5) as a result of the foregoing, the G7 was less reliable than prior iterations, which caused users to suffer material health risks; and (6) as a result, DexCom suffered increased regulatory scrutiny and enforcement, as well as legal, reputational, and financial harm. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

***March 7, 2025 FDA Warning Letter Form 8-K***

215.   The truth continued to emerge on March 7, 2025, when DexCom filed the FDA Warning Letter Form 8-K. The FDA Warning Letter Form 8-K revealed that DexCom had received the Warning Letter from the FDA resulting from issues with the Company's manufacturing processes and quality management systems at certain manufacturing facilities, stating that "[t]he warning letter describes observed non-conformities in manufacturing processes and quality management system." The FDA Warning Letter Form 8-K represented to investors that "[t]he warning letter does not restrict the Company's ability to produce, market, manufacture or distribute products, require recall of any products, nor restrict the Company's ability to seek FDA 510(k) clearance of new products."

216.   On this news, the price of the Company's stock fell $7.12 per share, or 9.2%, from a closing price of $77.84 March 7, 2025 to close at $70.72 per share on March 10, 2025. However, the Individual Defendants continued to obfuscate the truth about the safety and accuracy of the Company's CGM devices.

217.   For example, the Warning Letter Form 8-K failed to make note of the Company's G6 and G7 devices, let alone the FDA's issue was with material design changes to the G6 and G7. Moreover, the Warning Letter Form 8-K failed to disclose the severity of the FDA's findings, namely that the Company had sold adulterated products by replacing a key resistance layer compound in its sensors with a subpar compound in the absence of FDA approval.

***March 9, 2025 Equity Analyst Conversations***

218.   On March 9, 2025, equity research analysts with BTIG reported on a conversation they had with "Dexcom's IR [Investor Relations]," led by Defendant Christensen (the "March 2025 BTIG Conversation"). During the March 2025 BTIG Conversation, Defendant Christensen

told BTIG analysts that "they *had* already implemented process controls three months ago in response to the Form 483s." Moreover, BTIG stated that "[m]anagement reiterated that *the warning letter has no impact on the company's commercial operations*."

219.    That same day, equity analysts with Raymond James reported on a "conversation with management on Friday night," March 7, which "gives us comfort that *this is not a product quality issue*," that "DXCM emphasized *that there are no quality issues with its product*," and that "sensors are performing as expected, and the 'non-conformities' *do not impact the end user*."

*March 10, 2025 Equity Analyst Conversations*

220.    On March 10, 2025, equity analysts at Baird reported the following, in relevant part:

> In speaking with management about this issue, we learned the FDA's concerns are *focused entirely on manufacturing processes*, many of which DXCM believes already addressed and/or remediated (the FDA did not re-inspect DXCM's facilities after last year's inspections and prior to issuing its Warning Letter). Notably, the FDA's *observations/concerns don't mention overall product quality issues*.

221.    That same day, analysts with UBS reported that the Company's management emphasized to them that "the 7 observations [in the Warning Letter] *have nothing to do with product quality* and are rather very specific around certain manufacturing processes, i.e., the concentration of solution used to test acetaminophen sensitivity."

222.    The above statements in ¶¶217-221 were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company committed the Manufacturing Misconduct; (2) the Company committed the G7 Adulteration Misconduct; (3) the G7's reliability, accuracy, and functionality were overstated; (4) the scope and severity of the issues with the G7 were downplayed by the Individual Defendants; (5) as a result of the foregoing, the G7 was less reliable than prior iterations, which caused users to suffer material health risks; and (6) as a result, DexCom

suffered increased regulatory scrutiny and enforcement, as well as legal, reputational, and financial harm. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *March 25, 2025 The FDA Publishes the Warning Letter*

223.    The truth continued to emerge on March 25, 2025, when the FDA published the warning letter on its website. The Warning Letter identified several of the same violations as the June 2024 and November 2024 Form 483s, notably that the Company was distributing an "adulterated" version of the G7, after it had replaced a "component used in the resistance layer of [its] sensors" without FDA approval. In addition, the Warning Letter disclosed that the Company's studies intended to demonstrate the equivalence of the old and adulterated sensors only showed that the adulterated sensor "performs worse . . . for accuracy." The Warning Letter noted that the Company's manufacturing process for the G7 included numerous issues, such as the Company arbitrarily setting acceptable MARD levels in absence of documentation. Moreover, the Warning Letter reported that the Company was testing the G7's accuracy without properly controlling or monitoring the concentrations of critical substances.

224.    The Warning Letter also revealed that the Company's responses were actually worse, as the additional data had revealed that the new resistance layer material caused "higher risks for users who rely on the sensors to dose insulin or make other diabetes treatment decisions." The Warning Letter had also encouraged the Company to "investigate and determine the causes of any violations" since the violations that were identified "may be symptomatic of serious problems in [DexCom's] manufacturing and quality management systems."

225.    On this news, the price of the Company's stock fell $3.19 per share, or 4.2%, over the following two trading sessions, from a closing price of $75.32 on March 24, 2025 to close at

$72.13 per share on March 26, 2025. However, the Individual Defendants continued to obfuscate the truth about the safety and accuracy of the Company's CGM devices.

### March 25, 2025 MedTech Dive Interview

226.    For instance, on March 25, 2025, the publication *MedTech Dive* published an interview which it conducted with Defendant Leach the prior week (the "MedTech Dive Interview"). During the MedTech Dive Interview, Defendant Leach stated the following, in relevant part:

> [The FDA has] spent a lot of time looking at how our design documents traced all the way through to our production testing, and how we build our sensors. They had some concerns about how we were doing that. ***We answered those concerns with better documentation around how we build sensors and why we do the testing we do***. The [W]arning [L]etter is their response saying, "You've answered a lot of our questions, but there's still some that we have open that we need to work together on."

### March 25, 2025 Equity Analyst Conversations

227.    On March 25, 2025, the Company's management spoke with Wells Fargo analysts, who went on to report the Company's explanation concerning new sensor material for the following, in relevant part:

> [DexCom's explanation] refers to a dipping material that DXCM developed in-house (prev sourcing from a single, external supplier) in order to increase supply. ***DXCM notified the FDA of this insourcing as part of another 510(k) submission in 2024***. According to DXCM, the [Warning Letter] is stating that the ***FDA wants more information on this dual-sourcing as its own 510(k) filing, which DXCM can provide***.

228.    That same day, the Company's management spoke with J.P. Morgan analysts who reported that management asserted that the FDA Warning Letter was of little concern because "***[t]he company included this in-sourcing in a 510(k) submission for something else last year and the FDA cleared it***." As such, the J.P. Morgan analysts concluded that "[t]his was basically a

long way of saying the quality control/validation issues were not related to G6/G7 sensor quality, but the specifics of this production process, which to our knowledge have been addressed."

229. The above statements in ¶¶226-228 were materially false and misleading and failed to disclose, *inter alia*, that: (1) the G7's reliability, accuracy, and functionality were overstated; (2) the scope and severity of the issues with the G7 were downplayed by the Individual Defendants; (3) as a result of the foregoing, the G7 was less reliable than prior iterations, which caused users to suffer material health risks; and (4) as a result, DexCom suffered increased regulatory scrutiny and enforcement, as well as legal, reputational, and financial harm. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

***March 27, 2025 Proxy Statement***

230. On March 27, 2025, the Company filed the 2025 Proxy Statement with the SEC. Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol solicited the 2025 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

231. The 2025 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, and Malady to the Board; (2) ratify the selection by the Audit Committee of the Board of Directors of Deloitte & Touche LLP as DexCom's independent registered public accounting firm for the 2025 fiscal year; (3) provide a non-binding advisory vote on the compensation for the Company's named executive officers for the 2024 fiscal year; (4) approve an amendment to the Amended and Restated 2015 Equity Plan (the "2025 Amendment to the A&R Equity Plan") to, among other things, increase the number of shares reserved for issuance thereunder by 3,400,000 shares; and

(5) approve the Amended and Restated 2015 Stock Purchase Plan to, among other things, increase the number of shares reserved for issuance thereunder by 8,000,000 shares.

232.    The 2025 Proxy Statement noted that if DexCom shareholders voted to approve of the 2025 Amendment to the A&R Equity Plan it would become effective immediately, as the pre-existing A&R Equity Plan was set to expire later in 2025. Further, the 2025 Proxy Statement notes the approval of the 2025 Amendment to the A&R Equity Plan will cause 3,400,000 shares to be made available under the A&R Equity Plan for issuance. Per the 2025 Proxy Statement, as of March 13, 2025, there were 10,204,483 shares still available for grant under the prior Plan, meaning that if the A&R Equity Plan is approved, there would be a total of 13,604,483 shares available for grant. The 2025 Proxy Statement states that employees and non-employee directors are eligible to participate in the A&R Equity Plan, and that if the A&R Equity Plan was not approved, the Company's "ability to attract and retain the talent" needed to compete "would be seriously and negatively impacted."

233.    Regarding "The Board of Directors' Role in Risk Oversight," the 2025 Proxy Statement stated, in relevant part:

> The Board is ultimately responsible for overseeing our risk assessment and risk management. In fulfilling this oversight role, our Board focuses on understanding the nature of our enterprise risks, including our operations and strategic direction, as well as the adequacy of our risk management process and overall risk management system. While the full Board has overall responsibility for risk oversight, the Board has delegated oversight responsibility related to certain risks to the standing committees of the Board.
>
> The Board
>
> At its regularly scheduled meetings, the Board received management updates and committee reports regarding business operations, financial results, committee activities, strategy, and discusses risk related to the business. Through management updates and committee reports, the Board monitors our risk management activities, including the enterprise risk management process and cybersecurity risks, risks relating to our compensation programs, and financial, legal, and operational risks.

71

Audit Committee

The Audit Committee assists the Board in its oversight of risk management by discussing with management our guidelines and policies regarding financial risk management, including major risk exposures, and the steps management has taken to monitor or mitigate such exposure.

***

Technology Committee

The Technology Committee assists the Board in its oversight of our technology plans and strategies, cybersecurity and major information technology risk exposures and the steps management has taken to monitor or mitigate such exposures.

***

Our Corporate Strategy Oversight Structure

Our Board actively oversees management's establishment and execution of corporate strategy, including major business and organizational initiatives, annual budget and long-term strategic plans, capital allocation priorities, potential corporate development opportunities, and risk management. Our objective is to remain a leading provider of glucose biosensors and related products to enable people with diabetes and those seeking to optimize metabolic health to more effectively and conveniently manage their glucose levels. We are also developing and commercializing products that integrate our CGM technologies into the insulin delivery systems or data platforms of our respective partners. In addition, we continue to pursue development partnerships with other insulin delivery companies, including automated insulin delivery systems, as well as other players in the disease management sector. The Board actively oversees our business strategies as we pursue these objectives.

The Board is regularly engaged with management on the Company's strategy. At its regularly scheduled meetings and throughout the year, our Board of Directors receives information and formal updates from our management and actively engages with the senior leadership team with respect to our corporate strategy. Our Board of Directors' diverse skill set and experience enhances its ability to support management in the execution and evaluation of our corporate strategy.

234.    Regarding the Company's Code of Ethics, the 2025 Proxy Statement provided:

We have adopted a Code of Conduct that is an essential resource for all of our officers, directors and employees. It outlines our values on a number of issues

affecting our business, sets requirements for business conduct, and serves as the basis for our compliance program. The Nominating and Governance Committee reviews and assesses the adequacy of the Code of Conduct on at least an annual basis, and may recommend that the Board establish special committees as may be desirable or necessary from time to time in order to address ethical, legal or other matters that may arise.

We encourage employees to keep open lines of communication with their supervisor and/or department management. Our compliance Intranet website provides additional information, including a global directory of compliance personnel; links to our compliance helpline; current policies, procedures, and resources; and training materials. The compliance helpline is hosted by a third-party helpline provider. Reports through the compliance helpline may remain anonymous.

When required by the rules of Nasdaq, or the SEC, we will disclose any future amendment to, or waiver of, any provision of the Code of Conduct for our principal executive officer and principal financial officer or any member or members of our Board on our website within four business days following the date of such amendment or waiver.

235.   Regarding the Company's Audit Committee, the 2025 Proxy Statement stated the responsibilities of the Audit Committee as:

•Overseeing our accounting and financial reporting processes and the audits of our financial statements;

•Monitoring the periodic reviews of the adequacy of our accounting and financial reporting processes and systems of internal control that are conducted by our independent auditors and our financial and senior management;

•Reviewing and evaluating the independence and performance of our independent auditors;

•Reviewing with management our major financial risk exposures and the steps management has taken to monitor or mitigate such exposures; and

•Facilitating communication among our independent auditors, our financial and senior management and the Board.

236.   Regarding the Company's Technology Committee, the 2025 Proxy Statement stated the responsibilities of the Technology Committee as:

•Reviewing, evaluating and making recommendations to the Board regarding our major technology plans and strategies, including our research and development activities, as well as technical and market risks associated with product development and investment;

•Reviewing our research and development activities and product pipeline, and timelines for achievement of activities and pipeline; and

•Regularly reviewing the cybersecurity, privacy, data protection and other major information technology risk exposures of the company, the steps management has taken to monitor and control such exposures, and our compliance with applicable information security and data protection laws and industry standards.

237.   Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the G7's reliability, accuracy, and functionality were overstated; (2) the scope and severity of the issues with the G7 were downplayed by the Individual Defendants; (3) as a result of the foregoing, the G7 was less reliable than prior iterations, which caused users to suffer material health risks; and (4) as a result, DexCom suffered increased regulatory scrutiny and enforcement, as well as legal, reputational, and financial harm. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

238.   The 2025 Proxy Statement also failed to disclose, inter alia, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committee's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

239.   As a result of Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, inter alia, to: (1) re-elect Defendants Sayer, Altman, Augustinos,

Collins, Dahut, Driscoll, Foletta, Heller, and Malady to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the selection by the Audit Committee of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2025 fiscal year; (3) approve, on a non-binding advisory basis, the compensation of DexCom's named executive officers for the 2024 fiscal year; (4) approve the 2025 Amendment to the A&R Equity Plan to, among other things, increase the number of shares reserved for issuance thereunder by 3,400,000 shares; and (5) approve the Amended and Restated 2015 Employee Stock Purchase Plan to, among other things, increase the number of shares reserved for issuance thereunder by 8,000,000 shares.

240. As a result of shareholders approving the 2025 Amendment to the A&R Equity Plan, the plan took effect immediately upon reaching shareholder approval. Additionally, there were 3,400,000 shares available for issuance under the A&R Equity Plan. The Individual Defendants, many of whom are current directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading 2025 Proxy Statement and the shareholders approving the 2025 Amendment to the A&R Equity Plan. Moreover, certain of the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the A&R Equity Plan in the future.

***July 21, 2025 Diabetech Podcast***

241. On July 21, 2025, Defendant Leach appeared on the Diabetech podcast to discuss the FDA Warning Letter in an interview titled "*Dexcom Exec Interview: Sensor Failures, Recalls, and The Future of CGM*" (the "Diabetech Interview").

242.    During the Diabetech Interview, the interviewer stated that "Dexcom had received an FDA warning letter due to a change in a mechanism you were using from a third party to your own," and "that this resulted in less accurate sensors." After being asked "what happened here and how the accuracy was affected," Defendant Leach conceded that the Company had adulterated the G7 but asserted that no accuracy issues resulted from the change, stating the following:

> *Yeah so I think what is important to note is that there's no actual claim that the performance of the sensor isn't as accurate as the old one*. … And so while we still very much felt that what we did was appropriate, we took their feedback and said okay we won't manufacture sensors with that material until we redo a validation in the way you want to see it. *But you know ultimately in the product of the field it was not less accurate by any means. We did show them all the things that they would want to see to be able to verify it*.

243.    Later on during the Diabetech Interview, the interviewer asked whether any adulterated sensors constructed with unapproved resistance layer material were still in circulation. In response, Defendant Leach asserted no problem existed, stating that "we're not manufacturing with [the new material] anymore, *but there's no reason there's nothing wrong with those sensors*."

244.    The above statements in ¶¶241-243 were materially false and misleading and failed to disclose, *inter alia*, that: (1) the G7's reliability, accuracy, and functionality were overstated; (2) the scope and severity of the issues with the G7 were downplayed by the Individual Defendants; (3) as a result of the foregoing, the G7 was less reliable than prior iterations, which caused users to suffer material health risks; and (4) as a result, DexCom suffered increased regulatory scrutiny and enforcement, as well as legal, reputational, and financial harm . As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

*August 25, 2025 Third-Party Survey*

245. The truth continued to emerge on August 25, 2025, when a third-party survey of Durable Medical Equipment ("DME") companies, disclosed several concerns about the G7's reliability (the "DME Survey"). The DME Survey revealed that DME providers were still experiencing problems with the G7 in terms of performance and reliability.

246. On this news, the price of the Company's stock fell $6.30 per share, or 7.7%, over the following two trading sessions, from a closing price of $82.26 August 22, 2025 to close at $75.96 per share on August 25, 2025. However, the Individual Defendants continued to obfuscate the truth about the safety and accuracy of the Company's CGM devices.

### September 3, 2025 Wells Fargo Healthcare Conference

247. For instance, on September 3, 2025, Defendants Sylvain and Leach participated in the Wells Fargo Healthcare Conference. During a question-and-answer session, Defendant Leach was asked a question about "concerns around G7 reliability and accuracy issues." Defendant Leach minimized such concerns by stating "[s]o if you look at our metrics, things like warranty replacements, *complaint rates, performance of the sensor accuracy, all of that has continued to improve over time.* And *we haven't seen anything that has changed that trajectory*." Defendant Leach added that "[w]*hen it comes to accuracy, days of wear, all those things, we've seen nothing but improvements in that*."

248. The above statements in ¶ 247 were materially false and misleading and failed to disclose, inter alia, that: (1) the G7's reliability, accuracy, and functionality were overstated; (2) the scope and severity of the issues with the G7 were downplayed by the Individual Defendants; (3) as a result of the foregoing, the G7 was less reliable than prior iterations, which caused users to suffer material health risks; (4) as a result, DexCom suffered increased regulatory scrutiny and

enforcement, as well as legal, reputational, and financial harm. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

<strong><u>The Truth Fully Emerges</u></strong>

*September 18, 2025 Hunterbrook Report*

249.    The truth fully emerged on September 18, 2025, when Hunterbrook published the Hunterbrook Report. The Hunterbrook Report revealed the true scope of the health risks associated with the G7, including reports of user hospitalization and death after the G7 gave incorrect glucose readings.

250.    For instance, the Hunterbrook Report disclosed the death of William Harold Sosbe in June 2025, who died while wearing a G7. The Company's data revealed that Mr. Sosbe experienced "severe signal loss" in the months leading up to his death, and that his G7 readings stopped entirely in the two days leading up to his death. In connection with Mr. Sosbe's death while wearing the G7, Mr. Sosbe's sister stated that "[h]e trusted it and he's dead."

251.    Likewise, the Hunterbrook Report discussed the case of Diana Bates Knight, whose six-year-old daughter with Type 1 diabetes had to be taken to the emergency room to treat a life-threatening complication after the G7 she was wearing misread her blood sugar by "hundreds of points[.]" Moreover, the Hunterbrook Report reported that Bob Hawkinson passed out behind the wheel of his automobile after his G7 failed to alert him of a dangerously low blood sugar level. Similarly, Courtney Duffy was found unresponsive by her roommate after her G7 failed to connect her to her automated insulin pump. As such, the Hunterbrook Report also noted that a personal injury law firm researching the G7 was contacted by over 400 people involving more than 60 claims, which included alleged hospitalizations and "several claims involv[ing] a user's death."

252.    The Hunterbrook Report also provided numerous accounts from endocrinologists and healthcare providers pertaining to the G7's issues. For instance, multiple physicians disclosed to Hunterbrook that they had "stopped putting patients on the G7 altogether." In addition, the Hunterbrook Report included the account of a program director for a California diabetes center who stated that he had become "increasingly frustrated with Dexcom 'gaslighting' its customers" and "providing no public recognition and no recognition to doctors who are prescribing this." Similarly, the Hunterbrook Report quoted an endocrinologist at NYU Langone who stated that "many patients report[ed] issues with the G7 this year."

253.    The Hunterbrook Report also contained the accounts of several former Company employees, who described the Company's prioritization of financial gain over patient safety. The Hunterbrook Report noted a former regional account executive who stated that "Dexcom is trying to hold on to large revenue margins. And whenever you try and do that, *you are going to run into an area where you compromise the product, and I think they've done that*." The Hunterbrook Report also reported that a former senior scientist stated that the electrochemistry and membrane teams, the groups responsible for the unauthorized change to the G7, possessed weak scientific credentials and that "[t]he technical level was very low." Edward Carr, the Company's former senior director of manufacturing at its Mesa, Arizona facility, was quoted in the Hunterbrook report as having stated "Dexcom definitely dropped the ball." Mr. Carr added that the Company had grown "so fast, so quick, they could not really produce really good data and analysis to show [how] they had come up with the manufacturing processes."

254.    The Hunterbrook Report also reported on the substantial increase in G7 accuracy complaints following the Company's adulteration analysis conducted in December 2023. The Hunterbrook Report provided an analysis of FDA adverse event data revealing that "[a]ccuracy

complaints comprise about 13% of all G7 reports, more than double the nearly 6% rate for the older G6 model." Moreover, the Hunterbrook Report stated that "G7 accuracy reports spiked dramatically for devices manufactured after December 2023, just when, as the FDA revealed, Dexcom implemented its unauthorized material change." The Hunterbrook Report also contained a chart which showed the accuracy complaint rate approximately tripling for devices manufactured after the material switch."

255.    On this news, the price of the Company's stock fell $8.99 per share over the course of two trading sessions, or 11.8%, from a closing price of $76.44 per share on September 17, 2025, to close at $67.45 per share on September 19, 2025.

## SUBSEQUENT DEVELOPMENTS

### September 18, 2025 MAUDE Report

256.    On September 18, 2025, the Company submitted a MAUDE report which described the death of a patient using the G7 (the "September 2025 MAUDE Report"). According to the September 2025 MAUDE Report, the patient had displayed signs of high blood sugar despite their G7's reading of low blood sugar. As a result of this improper reading, the patient was given an additional dose of glucose and later died with a blood sugar reading that was dangerously high.

### September 29, 2025 Class Action Lawsuit

257.    On September 29, 2025, a consumer class action complaint was filed against the Company, captioned *Levens et al. v. Dexcom, Inc.*, No. 25 Civ. 02565 (S.D. Cal. Sept. 29, 2025) (the "September 2025 Class Action"). The September 2025 Class Action alleges that alterations in the G7's sensor materials resulted in "considerably greater variability" than sensors manufactured with FDA-approved materials.

### October 15, 2025 Class Action Lawsuit

258.    On October 15, 2025, another consumer class action complaint was filed against the Company, captioned *Grisoli v. Dexcom, Inc.*, No. 25 Civ. 2333 (C.D. Cal. Oct. 15, 2025) (the "October 2025 Class Action"). The October 2025 Class Action alleges that the Company marketed the G7 as "the most accurate" CGM while misleading patients as to the product's safety, reliability, accuracy, and efficacy.

### October 26, 2025 Newsweek Article

259.    On October 26, 2025, *Newsweek* published an article titled "It's Life-Threatening'—Dexcom G7 Users Say Glucose Monitor Is Failing Them (the "Newsweek Article"). The Newsweek Article stated the following, in relevant part:

> Over the past year, patients and caregivers have reported inconsistencies with the G7's readings—sharp highs when blood sugar is actually stable, or plummeting lows that don't match fingerstick tests. These discrepancies have led to confusion, fear, and, in some cases, physical danger. And while many say Dexcom is aware of the issue, users describe the company's response as limited primarily to silence, apologies, and sporadic replacements.

260.    The Newsweek Article also included accounts of patients who used the G7 and experienced life-threatening events as a result of its malfunctioning. The Newsweek Article denotes, *inter alia*: (1) a patient who used the G7 when it missed her "dangerously low" blood glucose level; (2) the mother of a patient using the G7 who reported that "finger-stick tests showed [the G7s] were often 60 to 80 points off and noted that "the devices [Dexcom is] putting out aren't safe; and 3) a Company customer who reported a "striking . . . 70% failure rate among the users he surveyed."

### October 30, 2025 Earnings Call

261.    On October 30, 2025, the Company hosted an earnings call regarding its financial results for the third quarter of 2025 (the "3Q 2025 Earnings Call"). During the 3Q 2025 Earnings Call, the Individual Defendants noted that the Company's margins continued to decline year-over-

year, from 64% in the third quarter of 2024 to 61% in the third quarter of 2025. During the 3Q 2025 Earnings Call, Defendant Leach stated that he "recognize[s] the investment community is attempting to interpret data on [the] topic" of the "customer experience[.]"

262. Later on during the 3Q 2025 Earnings Call, an analyst asked whether the "commentary around G7 and G7 performance" had "been disruptive" to signing new customers. In response, Defendant Sylvain conceded that "there's likely been a bit of an impact" concerning the signing up of new customers. Likewise, another analyst asked about "attrition rates" as the Company "dealt with some of the quality issues[.]" Defendant Sylvain responded by stating that "when customers have issues, they tell their prescribers about it."

### *February 12, 2026 Form 10-K*

263. On February 12, 2026, the Company filed its annual report on Form 10-K with the SEC reporting the Company's financial results for the 2025 fiscal year (the "2025 Form 10-K"). The 2025 Form 10-K disclosed that "problems with "manufacturing processes" and "quality management" remained unresolved. More specifically, the 2025 Form 10-K stated that "we cannot give any assurances that the FDA will be satisfied with our response or as to the date we expect to resolve the matters included in the FDA Warning Letter." Moreover, the 2025 Form 10-K stated that "[u]ntil the issues cited in the [W]arning [L]etter are resolved to the FDA's satisfaction, additional legal or regulatory action may be taken without further notice."

### *March 5, 2026 Lawsuit*

264. On March 5, 2026, another complaint was filed on behalf of an individual who ultimately died as a result of the G7's inaccurate readings, captioned *May v. Dexcom, Inc.*, 26CU012528C (Cal. Sup. Ct. Mar. 5, 2026) (collectively, with the September 2025 Class Action Lawsuit and the October 2025 Class Action Lawsuit, the "Consumer Actions").

**REPURCHASES DURING THE RELEVANT PERIOD**

265. During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $937.2 million to repurchase approximately 12.8 million shares of its own common stock at artificially inflated prices from July 2024 through September 2025.

266. According to the 3Q 2024 Form 10-Q, between July 1, 2024 and July 31, 2024, the Company repurchased 2,674,792 shares of its own common stock at an average price per share of approximately $69.43, for a total cost to the Company of approximately $185,710,809.

267. As the Company's stock was actually worth only $67.45 per share, the price at closing on September 19, 2025, the Company overpaid by approximately $5,296,088 for repurchases of its own stock between July 1, 2024 and July 31, 2024.

268. According to the 3Q 2024 Form 10-Q, between August 1, 2024 and August 31, 2024, the Company repurchased 7,756,404 shares of its own common stock at an average price per share of approximately $72.75, for a total cost to the Company of approximately $564,278,291.

269. As the Company's stock was actually worth only $67.45 per share, the price at closing on September 19, 2025, the Company overpaid by approximately $41,108,941 for repurchases of its own stock between August 1, 2024 and August 31, 2024.

270. According to the quarterly report filed on Form 10-Q for the third fiscal quarter of 2025 (the "3Q 2025 Form 10-Q"), between August 1, 2025 and August 31, 2025, the Company repurchased 1,998,100 shares of its own common stock at an average price of $78.57, for a total cost to the Company of approximately $156,990,717.

271.     As the Company's stock was actually worth only $67.45 per share, the price at closing on September 19, 2025, the Company overpaid by approximately $22,218,872 for repurchases of its own common stock between August 1, 2025 and August 31, 2025.

272.     According to the 3Q 2025 Form 10-Q, between September 1, 2025 and September 30, 2025, the Company repurchased 406,399 shares of its own common stock at an average price per share of approximately $74.45, for a total cost to the Company of approximately $30,256,406.[5]

273.     As the Company's stock was actually worth only $67.45 per share, the price at closing on September 19, 2025, the Company overpaid by approximately $2,844,793 for repurchases of its own common stock between September 1, 2025 and September 30, 2025.

274.     Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $71.4 million.

## THE INDIVIDUAL DEFENDANTS' KNOWLEDGE

275.     Throughout the Relevant Period, the Individual Defendants had access to internal metrics and information pertaining to the safety and accuracy of the Company's CGM devices. The Individual Defendants' knowledge as to the materially false and misleading nature of the statements they made is evident through the accounts of several former employees of the Company.

### *Former Employee Testimony*

276.     The Company's former employees reported in the Amended Class Action Complaint that the Company's decision to adulterate the G7 was made by senior management, as opposed to lower-level employees operating on their own accord. For instance, Former Employee 1 stated that he was "told" by Company Vice President Ian Topic "that they were going to use

---

[5] Upon information and belief, such repurchases were made during the Relevant Period.

material A instead of material B." Former Employee 1 explained that the reason for this change was to "make it a cheaper process and material."

277. Moreover, Former Employee 4 stated that the material change noted by Former Employee 1 was continually discussed in the Company's Project Review Board ("PRB") meetings held in San Diego monthly, both in-person and over video communication. Former Employee 4 added that such PRB meetings were conducted by Executive Vice President, Global Operations, Barry Regan, who reported directly to Defendant Leach.

278. Former Employee 4 reported that he was present in PRB meetings where management discussed the replacement of its resistance layer material with an internally designed formula. Former Employee 4 also stated that the technical staff in charge of the project consistently presented the project's progress at PRB meetings.

279. Former Employee 4 went on to confirm that the Company studied the impact of its decision to adulterate the G7 and were thus aware of the negative impacts of the adulteration on the product's accuracy. Former Employee 4 likewise confirmed that such studies were discussed at the monthly PRB meetings with Executive Vice President Regan.

280. Former Employee 4 reported that issues with the adulterated product's equivalency with other, unadulterated products were discussed at the monthly PRB meetings. Notably, Former Employee 4 stated that the sentiment surrounding the project was that it "was not meeting objectives." Moreover, Former Employee 4 noted that the results of the Company's clinical trials and its equivalency data were presented and discussed at the monthly PRB meetings, and added that "all of that information was reviewed and explained to the audience of leaders in the meeting."

281. Former Employee 1 reported that the Company's MARD threshold could range from 12.5% to 15%, significantly higher than the figure of 8.2% the Company repeated throughout

the Relevant Period. Former Employee 1 noted that management would indicate that because "[w]e can't afford doing 15%, we have to bring it down to 12.5[.]" Former Employee 1 added that senior management provided the acceptable MARD manufacturing thresholds for the day through daily meetings at the Company's facility in Mesa. Former Employee 1 stated that MARD threshold orders came from Vice President Ian Topic, who reported to Executive Vice President of Global Operations Barry Regan.

282. The Company's former employees also described the Company's efforts to conceal quality problems from the FDA. More specifically, Former Employee 6 described how Company employees "were directly told not to talk about drift if the FDA came in."[6] Former Employee 6 also stated that the G7's drift issues were discussed along with other sensor-related issues at the Company's weekly "roll up" meetings in which the various departments presented updates to management. Former Employee 6 recounted that Executive Vice President of Global Operations Barry Regan and Vice President Ian Topic attended such "roll-up" meetings. Former Employe 6 further reported that he was personally told on at least two occasions not to discuss drift with the FDA, first on the morning of an FDA inspection in June 2024 and second shortly after the June 2024 inspection.

283. Former Employee 2 recounted that "management was constantly pushing, pushing, pushing, and pressuring its developers, testers and quality assurance to be faster." Former Employee 2 substantiated this assertion by explaining that Chief Technology Officer ("CTO") Girish Naganathan personally engaged in the rushing of Company projects, emailing employees that they "MUST" complete features by the requisite deadlines even when "most working on the project thought this was impossible."

---

[6] "Drift" refers to how the G7's accuracy changes over the course of a multi-day wear period.

284.    Former Employee 2 also explained that he identified roughly 1,000 to 1,500 software issues in connection with the Company's attempts to satisfy its promises to the FDA. Yet, Former Employee 2 stated that these software issues were brought to the attention of his supervisor, Sri Harsha Maramraju, Senior Manager of Systems Design Engineering, who reported to CTO Naganathan. According to Former Employee 2, Mr. Maramraju told him not to be concerned, and that such deficiencies could be explained away.

## DAMAGES TO DEXCOM

285.    As a direct and proximate result of the Individual Defendants' conduct, DexCom has lost and expended, and will continue to lose and expend, many millions of dollars.

286.    Such losses include the approximately $71.4 million the Company overpaid when it repurchased its own common stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

287.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

288.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, including the G7 Adulteration Misconduct and the Manufacturing Misconduct, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

289.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken

against the Company due to its violations of law, including the Consumer Actions, and payments of any fines or settlement amounts associated with the Company's violations.

290. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

291. As a direct and proximate result of the Individual Defendants' conduct, DexCom has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

## **DERIVATIVE ALLEGATIONS**

292. Plaintiff brings this action derivatively and for the benefit of DexCom to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of DexCom, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

293. DexCom is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

294. Plaintiff is, and has been at all relevant times, a shareholder of DexCom. Plaintiff will adequately and fairly represent the interests of DexCom in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

295.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

296.    A pre-suit demand on the Board of DexCom is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following twelve individuals: Defendants Sayer, Altman, Augustinos, Collins, Driscoll, Foletta, Heller, Leach, and Malady (the "Director-Defendants") and non-parties Renée Galá, Eugan Ashley, and Albert F. Osterloah, IV (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to six of the twelve Directors who are on the Board at the time this action is commenced.

297.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to engage in the G7 Adulteration Misconduct and the Manufacturing Misconduct and to make false and misleading statements and omissions of material facts, while they caused the Company to repurchase its own stock at artificially inflated prices. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

298.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted DexCom to engage in the G7 Adulteration Misconduct and the Manufacturing Misconduct and to issue materially false and misleading statements. Specifically, the Director-Defendants caused DexCom to issue false and misleading statements which were intended to make DexCom appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal

controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

299. In addition, the Director-Defendants caused the 2025 Proxy Statement to call for a shareholder vote to approve of the 2025 Amendment to the A&R Equity Plan. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2025 Amendment to the A&R Equity Plan who would not have approved of the 2025 Amendment to the A&R Equity Plan, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the 2025 Amendment to the A&R Equity Plan at the annual meeting of the stockholders of DexCom on May 8, 2025, the previously existing plans were to set to expire on May 8, 2025. For this reason, the Individual Defendants, including the Director-Defendants received material personal benefits that they otherwise would not receive but for from the issuance of the false and misleading 2025 Proxy Statement and the shareholders approving the 2025 Amendment to the A&R Equity Plan that made 3,400,000 shares available under the Plan. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

300. Additional reasons that demand on Defendant Sayer is futile follow. Defendant Sayer has served as a Company director since November 2007 and as Chairperson of the Board since July 2018. He previously served as DexCom's CEO from January 2015 until December 2025. The Company previously provided Defendant Sayer with his primary occupation, for which he received handsome compensation. Thus, as the Company admits, he is not an independent director. As the Company's former highest officer, he conducted little, if any, oversight of the schemes to cause the Company to engage in the G7 Adulteration Misconduct and the

Manufacturing Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Defendant Sayer also signed the false and misleading 2023 and 2024 Form 10-Ks, and the 1Q 2024, 2Q 2024, and 3Q 2024 Form 10-Qs. Defendant Sayer also solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company. Additionally, Defendant Sayer solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment to the A&R Equity Plan. Moreover, under the 2025 Amendment to the A&R Equity Plan, Defendant Sayer is eligible to receive stock awards under the A&R Equity Plan, thereby materially benefitting from the adoption of the 2025 Amendment to the A&R Equity Plan. Further, Defendant Sayer's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements herein, further demonstrate his motive in facilitating and participating in the schemes. Moreover, Defendant Sayer is a defendant in the Securities Class Action. For these reasons, too, Defendant Sayer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

301.    Additional reasons that demand on Defendant Leach is futile follow. Defendant Leach has served as the Company's CEO and as a Company director since January 1, 2026.

Previously, he served as DexCom's COO from August 2022 until December 2025 and as Interim CEO from September 15, 2025 until December 2025. The Company provides Defendant Leach with his primary occupation, for which he receives handsome compensation. Thus, as the Company admits, he is not an independent director. As the Company's highest officer, he conducted little, if any, oversight of the schemes to cause the Company to engage in the G7 Adulteration Misconduct and the Manufacturing Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Further, Defendant Leach's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements herein, further demonstrate his motive in facilitating and participating in the schemes. Moreover, Defendant Leach is a defendant in the Securities Class Action. For these reasons, too, Defendant Leach breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

302.　Additional reasons that demand on Defendant Altman is futile follow. Defendant Altman has served as a Company director since November 2013. He also serves as a member of the Compensation Committee and the Nominating and Governance Committee. Defendant Altman receives handsome compensation for his role as a director. As a trusted, long-time Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the G7 Adulteration Misconduct and the Manufacturing Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting

and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Altman personally signed the false and misleading 2023 and 2024 Form 10-Ks. Moreover, Defendant Altman solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and resulted in, *inter alia*, the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach fiduciary duties to the Company. Defendant Altman also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment to the A&R Equity Plan. Moreover, under the 2025 Amendment to the A&R Equity Plan, Defendant Altman is eligible to receive stock awards under the A&R Equity Plan, thereby materially benefitting from the adoption of the 2025 Amendment to the A&R Equity Plan. Further, Defendant Altman's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements herein, further demonstrate his motive in facilitating and participating in the schemes. For these reasons, too, Defendant Altman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

303. Additional reasons that demand on Defendant Augustinos is futile follow. Defendant Augustinos has served as a Company director since November 2009. He also serves as the Chair of the Nominating and Governance Committee. Defendant Augustinos receives handsome compensation for his role as a director. As a trusted, long-time Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the G7 Adulteration Misconduct and the Manufacturing Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and

93

engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Augustinos personally signed the false and misleading 2023 and 2024 Form 10-Ks. Moreover, Defendant Augustinos solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and resulted in, *inter alia*, the re-election of himself and other the Director-Defendants, thereby allowing them to continue to breach fiduciary duties to the Company. Defendant Augustinos also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment to the A&R Equity Plan. Moreover, under the 2025 Amendment to the A&R Equity Plan, Defendant Augustinos is eligible to receive stock awards under the A&R Equity Plan, thereby materially benefitting from the adoption of the 2025 Amendment to the A&R Equity Plan. Further, Defendant Augustino's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements herein, further demonstrate his motive in facilitating and participating in the schemes. For these reasons, too, Defendant Augustinos breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

304.    Additional reasons that demand on Defendant Collins is futile follow. Defendant Collins has served as a Company director since March 2017. He also serves as a member of the Audit Committee and the Nominating and Governance Committee. Defendant Collins receives handsome compensation for his role as director. As a trusted, long-time Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the G7 Adulteration Misconduct and the Manufacturing Misconduct and to make false and misleading

statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Collins personally signed the false and misleading 2023 and 2024 Form 10-Ks. Moreover, Defendant Collins solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and resulted in, *inter alia*, the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach fiduciary duties to the Company., Defendant Collins also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment to the A&R Equity Plan. Moreover, under the 2025 Amendment to the A&R Equity Plan, Defendant Collins is eligible to receive stock awards under the A&R Equity Plan, thereby materially benefitting from the adoption of the 2025 Amendment to the A&R Equity Plan. For these reasons, too, Defendant Collins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

305. Additional reasons that demand on Defendant Driscoll is futile follow. Defendant Driscoll has served as a Company director since August 2023. She also served as a member of the Audit Committee and the Technology Committee. Defendant Driscoll receives handsome compensation for her role as director. As a trusted, long-time Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the G7 Adulteration Misconduct and the Manufacturing Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Additionally,

Defendant Driscoll personally signed the false and misleading 2023 and 2024 Form 10-Ks. Moreover, Defendant Driscoll solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and resulted in, *inter alia*, the re-election of herself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Driscoll also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of herself and the Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment to the A&R Equity Plan. Moreover, under the 2025 Amendment to the A&R Equity Plan, Defendant Driscoll is eligible to receive stock awards under the A&R Equity Plan, thereby materially benefitting from the adoption of the 2025 Amendment to the A&R Equity Plan. For these reasons, too, Defendant Driscoll breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

306. Additional reasons that demand on Defendant Foletta is futile follow. Defendant Foletta has served as a Company director since November 2014. He also serves as the Lead Independent Director and as Chair of the Audit Committee. Defendant Foletta receives handsome compensation for his role as director. As a trusted, long-time Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the G7 Adulteration Misconduct and the Manufacturing Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Foletta personally signed the false and misleading 2023 and 2024 Form 10-Ks. Moreover, Defendant Foletta solicited the 2024 Proxy Statement, which contained material

96

misrepresentations and omissions and resulted in, *inter alia*, the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Foletta also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment to the A&R Equity Plan. Moreover, under the 2025 Amendment to the A&R Equity Plan, Defendant Foletta is eligible to receive stock awards under the A&R Equity Plan, thereby materially benefitting from the adoption of the 2025 Amendment to the A&R Equity Plan. Further, Defendant Foletta's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements herein, further demonstrate his motive in facilitating and participating in the schemes. For these reasons, too, Defendant Foletta breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

307. Additional reasons that demand on Defendant Heller is futile follow. Defendant Heller has served as a Company director since September 2019. She also serves as the Chair of the Compensation Committee. Defendant Heller receives handsome compensation for her role as a Company director. As a trusted, long-time Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the G7 Adulteration Misconduct and the Manufacturing Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Additionally, Defendant Heller personally signed the false and misleading 2023 and 2024 Form 10-Ks.Moreover, Defendant Heller solicited

the 2024 Proxy Statement, which contained material misrepresentations and omissions and resulted in, *inter alia*, the re-election of herself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Heller also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of herself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment to the A&R Equity Plan. Moreover, under the 2025 Amendment to the A&R Equity Plan, Defendant Heller is eligible to receive stock awards under the A&R Equity Plan, thereby materially benefitting from the adoption of the 2025 Amendment to the A&R Equity Plan. Further, Defendant Heller's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements herein, further demonstrate her motive in facilitating and participating in the schemes. For these reasons, too, Defendant Heller breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

308.    Additional reasons that demand on Defendant Malady is futile follow. Defendant Malady has served as a Company director since October 2020. He also serves the Chair of the Technology Committee. Defendant Malady receives handsome compensation for his role as director. As a trusted, long-time Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the G7 Adulteration Misconduct and the Manufacturing Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Malady personally signed the false and misleading 2023 and 2024 Form 10-Ks. Moreover, Defendant Malady

solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and led to the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Malady also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment to the A&R Equity Plan. Moreover, under the 2025 Amendment to the A&R Equity Plan, Defendant Malady is eligible to receive stock awards under the A&R Equity Plan, thereby materially benefitting from the adoption of the 2025 Amendment to the A&R Equity Plan. Further, Defendant Malady's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements herein, further demonstrate his motive in facilitating and participating in the schemes. For these reasons, too, Defendant Malady breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

309.    Additional reasons that demand on the Board is futile follow.

310.    Defendants Foletta (as Chair), Collins, and Driscoll (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their

risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

311.    Defendants Malady (as Chair) and Driscoll (the "Technology Committee Defendants") served as members of the Technology Committee at all relevant times. As such, they were responsible for monitoring the technical and market risks associated with the Company's product development and investment. During the Relevant Period, they violated the Technology Committee Charter by failing to ensure adequate Board oversight over technical and market risks associated with product development and investment, monitor the Company's progress against program objectives including revenue, efficiency, and product development targets, and failed to review the Company's research and development activities and product pipeline. Thus, the Technology Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

312.    All the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

313.    In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to engage in the G7 Adulteration Misconduct and the Manufacturing Misconduct and to

issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, and conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

314. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

315. The acts complained of herein constitute violations of fiduciary duties owed by DexCom's officers and directors, and these acts are incapable of ratification.

316. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of DexCom. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter

alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of DexCom, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

317.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause DexCom to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

318.    Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
**Against Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol for Violations of Section 14(a) of the Securities Exchange Act of 1934**

319.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

320.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

321.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

322.    Under the direction and watch of the Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol, the 2024 Proxy Statement failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

323.    The 2024 Proxy Statement also failed to disclose that: (1) the Company committed the Manufacturing Misconduct; (2) the Company committed the G7 Adulteration Misconduct; (3) the G7's reliability, accuracy, and functionality were overstated; (4) the scope and severity of the issues with the G7 were downplayed by the Individual Defendants;  (5) as a result of the foregoing, the G7 was less reliable than prior iterations, which caused users to suffer material health risks; and (6) as a result, DexCom suffered increased regulatory scrutiny and enforcement, as well as legal, reputational, and financial harm. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

324.   In the exercise of reasonable care, Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Holler, Malady, and Topol knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement including, but not limited to, the re-election of the Director-Defendants.

325.   As a result of Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the selection of the Audit Committee of Ernst & Young LLP as the Company's independent registered public accounting from for the 2024 fiscal year; and (3) provide a non-binding advisory vote on the compensation for the Company's named executive officers for the 2023 fiscal year.

326.   Under the direction and watch of the Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol, the 2025 Proxy Statement failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

327. The 2025 Proxy Statement also failed to disclose that: (1) the G7's reliability, accuracy, and functionality were overstated; (2) the scope and severity of the issues with the G7 were downplayed by the Individual Defendants; (3) as a result of the foregoing, the G7 was less reliable than prior iterations, which caused users to suffer material health risks; and (4) as a result, DexCom suffered increased regulatory scrutiny and enforcement, as well as legal, reputational, and financial harm. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

328. In the exercise of reasonable care, Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Holler, Malady, and Topol knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement including, but not limited to, the re-election of the Director-Defendants and the approval of the 2025 Amendment to the A&R Equity Plan.

329. As a result of Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, inter alia, to: (1) re-elect Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, and Malady to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the selection by the Audit Committee of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2025 fiscal year; (3) approve, on a non-binding advisory basis, the compensation of DexCom's named executive officers for the 2024 fiscal year; (4) approve the 2025 Amendment to the A&R Equity Plan to, among other things, increase the number of shares reserved for issuance

thereunder by 3,400,000 shares; and (5) approve the Amended and Restated 2015 Employee Stock Purchase Plan to, among other things, increase the number of shares reserved for issuance thereunder by 8,000,000 shares.

330.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 and 2025 Proxy Statements.

331.    Plaintiff, on behalf of DexCom, has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

332.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein

333.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding DexCom. Not only is DexCom now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful schemes perpetrated upon DexCom by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase 12,835,695 of its own shares at artificially inflated prices, damaging DexCom.

334.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify

the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

335.    The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about DexCom not misleading.

336.    The Individual Defendants as top executives acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material fats set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though they were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

337.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

### THIRD CLAIM
**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

338.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

339.    The Individual Defendants, by virtue of their positions with DexCom and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of DexCom and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and

influence and exercised the same to cause DexCom to engage in the illegal conduct and practices complained of herein.

340.    Plaintiff, on behalf of DexCom, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

341.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

342.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of DexCom's business and affairs.

343.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

344.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of DexCom.

345.    In breach of their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the G7 Adulteration Misconduct and the Manufacturing Misconduct.

346.    In breach of their fiduciary duties owed to DexCom, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company committed the Manufacturing Misconduct; (2) the Company committed the G7 Adulteration Misconduct; (3) the G7's reliability, accuracy, and functionality were overstated; (4) the scope and severity of the issues with the G7 were downplayed by the Individual Defendants;  (5) as a result of the foregoing, the G7 was less reliable than prior iterations, which caused users to suffer material

health risks; and (6) as a result, DexCom suffered increased regulatory scrutiny and enforcement, as well as legal, reputational, and financial harm. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

347. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

348. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, thus rendering them personally liable to the Company for breaching their fiduciary duties.

349. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

350. In yet further breach of their fiduciary duties, during the relevant period the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed, while eight of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $38.5 million.

351. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of DexCom's securities.

352. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of DexCom's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent it from continuing to occur.

353. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

354. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, DexCom has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

355. Plaintiff, on behalf of DexCom, has no adequate remedy at law.

### FIFTH CLAIM
### Against Individual Defendants for Unjust Enrichment

356. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

357. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, DexCom.

358.    The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from DexCom that was tied to the performance or artificially inflated valuation of DexCom, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

359.    Plaintiff, as a shareholder and a representative of DexCom, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

360.    Plaintiff, on behalf of DexCom, has no adequate remedy at law.

### SIXTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

361.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

362.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused DexCom to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

363.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

364.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

365.   Plaintiff, on behalf of DexCom, has no adequate remedy at law.

### SEVENTH CLAIM
### Against Individual Defendants for Gross Mismanagement

366.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

367.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of DexCom in a manner consistent with the operations of a publicly held corporation.

368.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, DexCom has sustained and will continue to sustain significant damages.

369.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

370.   Plaintiff, on behalf of DexCom, has no adequate remedy at law.

### EIGHTH CLAIM
### Against Individual Defendants for Abuse of Control

371.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

372.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence DexCom, for which they are legally responsible.

373.   As a direct and proximate result of the Individual Defendants' abuse of control, DexCom has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

374.    Plaintiff, on behalf of DexCom, has no adequate remedy at law.

## NINTH CLAIM
**Against Defendants Sayer, Leach, Sylvain, and Christensen for Contribution Under Sections 10(b) and 21D of the Exchange Act**

375.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

376.    DexCom and Defendants Sayer, Leach, Sylvain, and Christensen are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Sayer's, Leach's, Sylvain's, and Christensen's willful and/or reckless violations of their obligations as officers and/or directors of DexCom.

377.    Defendants Sayer, Leach, Sylvain, and Christensen, because of their positions of control and authority as officers and/or directors of DexCom, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of DexCom, including the wrongful acts complained of herein and in the Securities Class Action.

378.    Accordingly, Defendants Sayer, Leach, Sylvain, and Christensen are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

379.    As such, DexCom is entitled to receive all appropriate contribution or indemnification from Defendants Sayer, Leach, Sylvain, and Christensen.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of DexCom, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to DexCom;

(c)     Determining and awarding to DexCom the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing DexCom and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect DexCom and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of DexCom to nominate at least six candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding DexCom restitution from Individual Defendants, and each of

114

them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: April 28, 2026

THE BROWN LAW FIRM, P.C.

*/s/Timothy Brown*
Timothy Brown
Saadia Hashmi
Elizabeth Donohoe
Zachary Benson
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
        shashmi@thebrownlawfirm.net
        edonohoe@thebrownlawfirm.net
        zbenson@thebrownlawfirm.net

*Counsel for Plaintiff*

Docusign Envelope ID: 4F15DE14-1E59-40A1-A820-21960B7985AC

## <u>VERIFICATION</u>

I, Jerome Malone, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 26th day of April 2026.

DocuSigned by:

C45AA1CF31314A3...

Jerome Malone